UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DEXTER WELCH, | ) |
|     Plaintiff, | ) ) ) |
| | ) Civil Action No. |
| v. | ) ) |
| UNITED NETWORK FOR ORGAN SHARING; and VANDERBILT UNIVERSITY MEDICAL CENTER, | ) **JURY DEMAND** ) ) ) |
|     Defendants. | ) |

# COMPLAINT FOR (1) VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964; (2) BREACH OF FIDUCIARY DUTY; AND (3) VIOLATION OF TENNESSEE HUMAN RIGHTS ACT (TENN. CODE ANN. §§ 4-21-101, ET SEQ.)

Plaintiff Dexter Welch ("Mr. Welch") brings this Complaint against the United Network for Organ Sharing ("UNOS") and Vanderbilt University Medical Center ("Vanderbilt" and collectively, the "Defendants"), and alleges as follows:

## Introduction

1. For more than two decades, UNOS and its affiliated transplant hospitals, including Vanderbilt, used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients. The race-based coefficient delayed Black kidney disease patients from being added to the kidney transplant waitlist solely based on race and resulted in Black candidates being forced to wait much longer for kidney transplants than similarly-situated White candidates.

1

2. Use of the race-based coefficient was not the result of any valid scientific or peer-reviewed studies. Instead, developers of the race-based coefficient postulated that Black Americans showed increased levels of creatinine extraction because they have greater muscle mass than White Americans, i.e., they relied solely on a defunct, eugenics-style racial stereotype.

3. Making medical policy based on racial stereotypes harmed all Black Americans waiting for a kidney, including Mr. Welch.

4. Mr. Welch is a family man residing in Nashville, Tennessee. Until recently Mr. Welch earned an honest living and supported his family by selling cars, for many years at Kia, and most recently for Nissan.

5. Mr. Welch was first diagnosed with kidney disease in approximately 2010. By 2018, his kidney disease advanced to the point where Mr. Welch was required to begin dialysis.

6. Despite his kidney disease and debilitating dialysis treatments, taking great pride in his work, Mr. Welch continued to work until late 2023, when Mr. Welch's kidney disease and dialysis caused him to develop serious heart disease.

7. Specifically, in 2023, Mr. Welch's medical condition worsened to the point where he required serious heart surgery to place multiple stents in his heart.

8. Not only was Mr. Welch no longer able to work, but he suffered significant pain and suffering and emotional distress stemming from his fear that he would not receive a kidney, and could ultimately pass away. Mr. Welch was forced to have difficult conversations with his family members, including asking his sister for one of her kidneys in order to save his life.

9. Having not received a donor kidney through UNOS, in 2021, and again in 2023, Mr. Welch's sister agreed to give him a potentially life-saving kidney. Vanderbilt, however, refused to perform the transplant, citing concern for potential health issues that could arise later in life for Mr. Welch's sister.

10. This refusal left Mr. Welch still in need of a kidney. It also left Mr. Welch with feelings of despair, feeling that Vanderbilt interfered with the private decision between his sister and him to undergo a transplant, and terrified that he will not receive a kidney before it is too late.

11. The source of these physically and mentally traumatizing events? Defendants' use of the race-based coefficient to taint Mr. Welch's—and countless other Black patients'—eGFR scores. Scores that Defendants now admit were artificially adjusted in a racist manner from the beginning.

12. In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[1]

Despite prohibiting future use of the race-based coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist with a lower priority based solely on their race.

13. In January of 2023, UNOS instructed transplant hospitals to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait time modification, but UNOS gave donor hospitals a year to complete this process, until January of 2024.

14. As a result of this process, in December of 2023, Mr. Welch first learned that he was entitled to an approximately *seven-year* wait time adjustment,

---

[1] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

through a verbal conversation with his surgeon. That is, Mr. Welch was first added to UNOS's kidney waitlist in 2018 when he began dialysis. But absent Vanderbilt's use of the race-based coefficient as knowingly incorporated by UNOS in its system, Mr. Welch would have qualified to join the waitlist in 2011.

15. Upon information and belief, had Mr. Welch's wait time been properly calculated originally, before December of 2023, when Mr. Welch's heart disease progressed to the point that he required heart surgery to place multiple stents in his heart, Mr. Welch would have accrued roughly *twelve* years of qualifying wait time and would have received a kidney transplant; likely significantly earlier.

16. Unfortunately, Mr. Welch's heart disease now makes a kidney transplant riskier and, citing this increased risk, Vanderbilt changed Mr. Welch's status to "inactive" on the kidney waitlist, such that Mr. Welch is not currently eligible to receive a kidney, even after his wait time adjustment. Vanderbilt told Mr. Welch he would be informed when he goes back to active status on the waitlist, but to date, Mr. Welch has received no such notification.

17. Mr. Welch's kidney transplant was delayed for many years, and his wait time adjustment may simply be too late. That is, if Mr. Welch is ever awarded a kidney, given his heart problems, he may not survive a transplant. And Mr. Welch may never even be given the opportunity to undergo such a procedure, given that Vanderbilt currently lists Mr. Welch in an inactive status.

18. Defendants' admitted discrimination against Black Americans by use of the race-based coefficient, at minimum, ruined Mr. Welch's life through years of delay and the resulting debilitating dialysis treatments, forcing Mr. Welch into early retirement. At worst, their discrimination will cost Mr. Welch his life. There must be serious consequences for hospitals and transplant organizations that engage in this type of pernicious racism.

## Parties

19. Mr. Welch is an individual residing in Nashville, Tennessee.

20. Mr. Welch is informed and believes, and thereon alleges, that Defendant UNOS is a Virginia nonprofit corporation with its principal place of business in Richmond, Virginia.

21. Mr. Welch is informed and believes, and thereon alleges, that Vanderbilt is a Tennessee nonprofit corporation with its principal place of business in Nashville, Tennessee.

## Jurisdiction and Venue

22. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Welch asserts a federal cause of action alleging racial discrimination. This Court further has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

23. Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Mr. Welch resides in this District and has been affected by Defendants' unlawful policies and procedures within this District. Vanderbilt is headquartered within this District and its interactions with Mr. Welch have occurred within the District, thus, a substantial part of the events or omissions that gave rise to the claims asserted herein occurred within this District.

24. This Court has personal jurisdiction over UNOS because UNOS conducts operations within Tennessee by virtue of its management of the kidney waitlist for all patients residing within the State, including Mr. Welch. UNOS makes decisions as to which patients residing in Tennessee will be offered donor kidneys.

25. This Court has personal jurisdiction over Vanderbilt because Vanderbilt maintains its principal place of business within the State, and harmed Mr. Welch by virtue of the unlawful conduct alleged herein within this State.

5

## General Allegations

**A.    The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys**.

26.    In 1984, Congress passed the National Organ Transplant Act, creating the Organ Procurement and Transplantation Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Per the Act, this registry was to be operated by a private, non-profit organization under federal contract.[2]

27.    Since that time, UNOS has acted as that private, non-profit organization, and per its website, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease.

28.    To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals and receive a referral from their physician. In this way, the transplant hospitals, like Vanderbilt, serve as gatekeepers to patients seeking to be placed on the national kidney waitlist.

29.    The national kidney waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR scores, into the UNet software, which tracks patient medical information and wait time.

30.    Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, and generates a list of potential matches, ranking potential matches on the national kidney waiting list. These

---

[2] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

31. Upon information and belief, the primary factor considered by UNet's algorithm to rank candidates for potentially compatible kidneys is a patient's accrued wait time. In other words, UNet will identify patients that are a medical match for a particular available kidney, and then rank those patients according to wait time.

32. Importantly, referral to the waitlist does not automatically start the clock on qualifying wait time. To accrue qualifying wait time, generally a patient's eGFR score must either fall below 20 ml/min, or the patient must begin dialysis.

### B. The Defendants applied a racially discriminatory coefficient to eGFR scores for Black patients.

33. UNOS is responsible for enacting policy concerning the selection of which patients receive which donor kidneys. In this regard, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

34. For decades, the race-based coefficient was applied to artificially inflate eGFR scores for Black Americans, overstating their kidney function by 16–18%, based upon the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their system.

35. As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score drops to 20 ml/min. But for Black patients, even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient was applied to artificially inflate the Black patients' eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

7

36. This practice led to many Black kidney disease patients never qualifying for wait time by eGFR score, their addition to the waitlist delayed until the start of dialysis (which is recommended when kidney function falls below 15 ml/min).

37. UNOS policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants. Specifically, UNOS is and has at all times been aware that its UNet software includes an algorithm that uses wait time as the primary factor in ranking patients for donor kidneys, and that its UNet software includes wait times for Black patients that have been manipulated by use of the race-based coefficient, including Mr. Welch's original wait time calculation. To be clear, this modification was made to Black patients' eGFR scores entirely because of their race and was not applied to other racial groups.

38. There has never been any serious scientific research to support use of the race-based coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

39. This, of course, is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in a 2021 article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

40. Years before UNOS took any action to review its policy allowing for use of the race-based coefficient, the practice was criticized by doctors for its racially discriminatory nature. For example, in November of 2011, Dr. Toni Martin

published an article in the *American Journal of Kidney Diseases* that questioned the practice, explaining that when she attempts to explain the policy to Black patients, she "get[s] a snort of disbelief[,]" and noting the history of purported genetic differences being used against Black Americans against a backdrop of "separate and unequal."[3]

41. Defendants thus knew or should have known that application of the race-based coefficient was not substantiated by rigorous scientific evidence.

42. Use of the race-based coefficient seriously diminishes Black patients' chances of receiving a donor kidney, and for Black patients that defeat the odds and ultimately receive a kidney from the national waitlist, their waiting time is still increased. Indeed, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis.

43. All other factors being equal, the above-described practices have resulted in non-Black patients receiving numerous kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

44. The failure to receive donor kidneys has caused significant harm to Black Americans. The unfortunate reality is that many Black Americans have already passed away that would have survived if given fair consideration for a donor kidney. Other Black Americans have suffered worsened kidney disease and/or been forced to go on dialysis because of the lengthened wait time for a donor kidney.

---

[3] To be clear, Mr. Welch was unaware of this article, and Mr. Welch was further unaware that his race affected his position on the wait list until December of 2023.

9

## C. Even after UNOS admitted the race-based coefficient discriminates against Black Americans, Defendants failed to timely address the problem.

45. In June of 2020, UNOS acknowledged the racial inequity plaguing the transplant system and the need for reform. In an article found at https://unos.org/news/racial-equity-in-transplantation/, UNOS professed a "commitment" to "saving and improving lives through transplantation, regardless of background, including race and ethnicity." But the race-based coefficient would remain in effect for years to come.

46. In June of 2022, UNOS finally admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[4]

UNOS posted the following on its website:

> **What are other issues with the race variable in eGFR?**
> EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."
>
> These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population. The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

---

[4] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

47. UNOS policy officially changed on July 27, 2022, with UNOS policy prior to that time expressly allowing for use of the race-based coefficient to artificially increase Black patients' eGFR scores.

48. Nonetheless, UNOS continued to use the race-based coefficient as a default. For more than six months, UNOS took no affirmative steps to adjust wait times and correct for previous use of the race-based coefficient.

49. On January 5, 2023, UNOS announced a new policy that would require donor hospitals to provide two notifications to patients on the national kidney waitlist, one notifying patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, and a second notification confirming this process was completed and informing patients of their status. UNOS also directed donor hospitals to investigate which patients are eligible for a wait time adjustment, and to request said adjustments within a year, i.e., by January of 2024.

50. While this adjustment in policy rightfully acknowledged the racially discriminatory nature of the race-based coefficient, it lacked required urgency, and for many of the 27,500 Black Americans then on the national kidney waitlist, like Mr. Welch, the policy change was too little too late. During the 18 months of lag time in adjusting wait times, Black Americans continued to suffer a race-based disadvantage in their candidacy for a donor kidney, with UNet continuing to utilize the old, improperly calculated wait times when awarding kidneys.

51. Moreover, it does not appear UNOS fulfilled its promise to complete required wait time adjustments. An OPTN report bragged that as of January 15, 2024, 14,849 wait time adjustments were processed. However, with approximately 27,500 Black waitlist members when this process began, this leaves in excess of 12,500 Black waitlist members without a processed wait time adjustment.

11

52. As discussed below, Mr. Welch developed serious heart problems near the end of the time provided by UNOS to transfer hospitals to update their wait time calculations, that could have potentially been avoided had Defendants moved faster to update their records.

### D. As a result of not being awarded a kidney in the transplant market, Mr. Welch has suffered significant harms.

53. Had the race-based coefficient not been applied to Mr. Welch's eGFR score, he would have first qualified by virtue of his eGFR score to join the kidney waitlist in 2011.

54. However, solely because Mr. Welch is Black, the race-based coefficient was applied to Mr. Welch's eGFR score to artificially increase the score above 20 mL/min, and Mr. Welch was not added to the kidney waitlist when a similarly situated White patient would have been added to the waitlist.

55. In fact, Mr. Welch was first placed on the kidney waitlist roughly seven years later in 2018, when Mr. Welch's kidney disease worsened to the point he was required to start dialysis. This was the first time he was added to any kidney waitlist.

56. Since that time, Mr. Welch has been required to travel to dialysis clinics and undergo extensive, uncomfortable treatment for approximately six years. The treatment is unpleasant, drains Mr. Welch's physical and mental energy, and has also caused Mr. Welch to suffer from severe emotional distress.

57. Mr. Welch was also forced to retire from his job selling cars, from which he had supported himself and his family for many years.

58. Mr. Welch's kidney disease put increased pressure on his heart and caused the Mr. Welch to develop heart disease. Mr. Welch's heart disease was first diagnosed in late 2023, roughly twelve years after he would have been placed on the waitlist without operation of the race-based coefficient (2011).

59. To treat Mr. Welch's heart disease, in late 2023, Mr. Welch was required to undergo a surgical procedure to place multiple stents in his heart.

60. Following this procedure, it is unclear whether Mr. Welch will be able to survive a kidney transplant, even if he is awarded a donor kidney. In this regard, Vanderbilt currently lists Mr. Welch as inactive, medically ineligible to be awarded a donor kidney.

61. The combination of Mr. Welch's kidney disease, and now heart disease, has required Mr. Welch to go through a litany of expensive, unpleasant medical procedures, resulting in physical pain and suffering, an inability to work or enjoy life, and severe emotional distress.

62. Even if Mr. Welch receives a kidney transplant now, and survives the transplant procedure—the best case scenario—he will still be left to deal with his heart disease which was caused by the kidney disease and likely could have been avoided if Mr. Welch had received a kidney transplant when he should have but for use of the race-based coefficient. The other, more grim scenario is that Mr. Welch will not receive a kidney transplant given the immense delay and his worsening health condition, and Mr. Welch will succumb to his ailments.

63. This would have all been avoided had Defendants not discriminated against Mr. Welch. He was entitled to join the waitlist in 2011, and he should have had seven eligible years on the kidney transplant waitlist before he required dialysis, and twelve eligible years on the kidney transplant waitlist prior to the development of his heart disease. Absent Defendants' discrimination, upon information and belief, Mr. Welch would have received a donor kidney before he required dialysis or developed severe heart disease.

64. While UNOS has attempted to defend its intentional, race-based discrimination by arguing wait time adjustments remedy any harm, any adjustment for Mr. Welch is at this time superfluous, with the adjustment not coming until Mr.

Welch was already required to undergo serious heart surgery, resulting in Vanderilt changing Mr. Welch's status to inactive on the waitlist. In that inactive status, Mr. Welch's thirteen years of qualifying wait time do him little good.

## Count One

### (Violation of Title VI of the Civil Rights Act of 1964)

65. Mr. Welch re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 64 above.

66. This cause of action is brought by Mr. Welch against all Defendants.

67. UNOS and Vanderbilt each receive significant financial assistance from the Federal government. Pursuant to contract with the U.S. Department of Health and Human Services, UNOS operates the Organ Procurement and Transplant Network mandated by the 1984 National Organ Transplant Act.

68. Approximately 10% of UNOS's budget is provided by the Federal government, in accordance with the National Organ Transplant Act's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS. These contracts were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

69. Vanderbilt receives significant financial assistance from the Federal government and its programs, funding both patient care and other related operations. As a participating transplant center, Vanderbilt participates in the nationwide kidney donation ecosystem managed by UNOS.

70. Defendants have engaged in racial discrimination. As alleged in detail above, Defendants allowed and encouraged use of the race-based coefficient to artificially inflate Black patients' eGFR scores, with UNOS adopting, encouraging, and knowingly using the race-based coefficient, and Vanderbilt applying the race-

based coefficient directly, thus delaying Mr. Welch's accrual of wait time, and prejudicing his chances of receiving a donor kidney.

71. Defendants knowingly input and used these modified wait times for Black patients in UNOS's UNet software, causing Black patients, including Mr. Welch, to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, all Defendants failed to take prompt action to ensure Mr. Welch's and other Black patients' wait times were recalculated.

72. The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Welch's award of a donor kidney. This discrimination also caused Mr. Welch to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and costs resulting from heart disease, and also lost wages stemming from early retirement because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

73. The above-described racial discrimination caused additional damages including but not limited to pain and suffering, severe emotional distress resulting in a looming fear of death, humiliation, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## Count Two
### (Breach of Fiduciary Duty)

74. Mr. Welch re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 73 above.

75. This cause of action is brought by Mr. Welch against Vanderbilt.

76. As the transplant hospital for Mr. Welch, Vanderbilt owed Mr. Welch a fiduciary duty. Mr. Welch entrusted Vanderbilt with his life and his personal medical information, relied upon Vanderbilt to act as his agent in the donor kidney

15

marketplace, and relied on Vanderbilt to use its best efforts to obtain for him a life-saving donor kidney.

77. Vanderbilt breached its fiduciary duty to Mr. Welch by knowingly submitting eGFR scores for Mr. Welch that were tainted by use of the race-based coefficient to UNOS for inclusion in its UNet algorithm, prejudicing Mr. Welch's chances of receiving a donor kidney. Even after UNOS changed course and outlawed use of the race-based coefficient, Vanderbilt failed for approximately another year to recalculate Mr. Welch's wait time.

78. The damages resulting from the above-described breaches of fiduciary duty include but are not limited to depriving and/or delaying Mr. Welch's award of a donor kidney. This discrimination also caused Mr. Welch to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and costs resulting from heart disease, and also lost wages stemming from early retirement because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

79. The above-described breaches of fiduciary duty caused additional damages including but not limited to pain and suffering, severe emotional distress resulting in a looming fear of death, humiliation, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## Count Three

**(Violation of the Tennessee Human Rights Act)**

80. Mr. Welch re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in paragraphs 1 through 79 above.

81. This cause of action is brought by Mr. Welch against all Defendants.

82. Vanderbilt operates a place of public accommodation to which Mr. Welch was denied full and fair access, and at which Mr. Welch was treated differently because of his race, to his detriment.

83. UNOS operates the national kidney waitlist, which is a public accommodation affecting kidney disease patients, including those in Tennessee like Mr. Welch. Mr. Welch was denied full and fair access to the national kidney waitlist because UNOS allowed for and encouraged use of the race-based coefficient—which was only applied to Black Americans like Mr. Welch because of their race, to their detriment.

84. Vanderbilt and UNOS engaged in racial discrimination. As alleged in detail above, Vanderbilt applied the race-based coefficient to artificially inflate Black patients' eGFR scores, including that of Mr. Welch, thus delaying Mr. Welch's accrual of wait time and prejudicing his chances of receiving a donor kidney. As alleged in detail above, UNOS allowed and encouraged use of the race-based coefficient to artificially inflate Black patients' eGFR scores, adopting, encouraging, and implementing the race-based coefficient as an official policy.

85. Defendants further knowingly input and used these modified wait times for Black patients, including Mr. Welch, in UNOS's UNet software, causing Black patients to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, all Defendants failed to take prompt action to ensure wait times were recalculated for Black patients, including Mr. Welch.

86. The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Welch's award of a donor kidney. This discrimination also caused Mr. Welch to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and costs resulting from heart disease, and also lost wages stemming from early retirement because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Vanderbilt.

17

87. The above-described racial discrimination caused additional damages including but not limited to pain and suffering, severe emotional distress resulting in a looming fear of death, humiliation, constant fatigue, the inability to travel, and the loss of enjoyment of life.

### **Prayer For Relief**

WHEREFORE, Mr. Welch prays for relief against Defendants as follows:

1. For preliminary and permanent injunctions enjoining and restraining UNOS and Vanderbilt, their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of, or in concert with UNOS or Vanderbilt, from engaging in the above-described racial discrimination;

2. For damages in compensation for the economic and medical and personal injuries suffered by the Mr. Welch in an amount to be determined by evidence;

3. For punitive damages in an amount according to proof;

4. For pre-judgment interest on all damages awarded by this Court;

5. For reasonable attorneys' fees and costs of suit incurred herein; and

6. For such other and further relief as the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Mr. Welch hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Respectfully submitted,

/s/ Jeffrey A. Greene
Jeffrey A. Greene
(Tenn. Bar No. 10972)
1852 Wilson Pike
Franklin, TN 37067
(615) 477-4917
jeff@jgreene.us

Attorney for Plaintiff, Dexter Welch