# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| DEXTER WELCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:24-cv-00422 |
| | ) | |
| UNITED NETWORK FOR ORGAN | ) | |
| SHARING, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case arises from the tragic circumstances of Plaintiff Dexter Welch ("Welch"), who has suffered from kidney disease, among other conditions, for some time. In this action, Welch is suing Defendants United Network for Organ Sharing ("UNOS") and Vanderbilt University Medical Center ("VUMC") (collectively, "Defendants") under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. ("Title VI"), the Tennessee Human Rights Act, Tenn. Code Ann. § 4–21–101, et seq. ("THRA"), and Tennessee state law. Welch alleges that Defendants' use of a race-based coefficient on estimated glomerular filtration rate ("eGFR") values for Black kidney transplant patients artificially inflated his kidney function such that he did not get placed on the national kidney transplant waitlist ("waitlist") when he first qualified, thereby depriving him of a kidney transplant.[1]

This case is on an expedited trial schedule, largely because of Welch's poor health. (Doc. No. 43 at 2). Due to that expedited timeframe, before the Court are various motions: UNOS's

---

[1] The term "race-based coefficient" is how Welch describes the eGFR-AA value that is at the heart of this case. (See Doc. No. 110 ¶ 32). For ease of reference, the Court will use the same language when referring to that value here.

Motion to Dismiss (Doc. No. 21); VUMC's Motion to Dismiss (Doc. No. 23); Welch's Motion for Summary Judgment (Doc. No. 95); and Defendants' Joint Motion for Summary Judgment (Doc. No. 86). All motions have been fully briefed and are ripe for review. (See Doc. Nos. 21–24, 33–34, 38–39, 86, 95, 108, 113). For the following reasons, the Court will rule as follows: UNOS's Motion to Dismiss (Doc. No. 21) will be granted on Welch's request for injunctive relief, and denied in all other respects; VUMC's Motion to Dismiss (Doc. No. 23) will be denied; Defendants' Motion for Summary Judgment (Doc. No. 86) will be granted on Welch's Title VI claim against UNOS, his breach of fiduciary duty claim against VUMC, and Welch's request for punitive damages, and will be denied in all other respects; and Welch's Motion for Summary Judgment (Doc. No. 95) will be denied. Welch's Motion for Oral Argument (Doc. No. 115) will be denied as moot.[2]

## I. BACKGROUND UNDISPUTED FACTS[3]

UNOS is a private, non-profit organization that manages the nation's Organ Procurement and Transplantation Network ("OPTN"), which maintains the national kidney transplant waitlist ("waitlist"). (Doc. No. 1 ¶¶ 26, 27; Doc. No. 110 ¶ 4). UNOS does this work pursuant to federal

---

[2] The Court acknowledges that many of the filings related to the instant summary judgment motions have been preliminarily filed under seal. (See, e.g., Doc. Nos. 76, 85, 93, 101, 107, 111). Because the Court sees no compelling reasons to justify the sealing of any information contained in its opinion, see Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan, 825 F.3d 299, 305 (6th Cir. 2016), it will remain public in its entirety.

[3] The Court relies upon the undisputed portions of the parties' responses to the statements of facts (Doc. Nos. 110, 112-1), the exhibits and depositions submitted with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) ("Complaint") that are not contradicted by the evidence in the record. For Defendants' motions to dismiss, unless otherwise stated, the Court relies only on the factual allegations in the Complaint, and assumes the truth of those allegations for purposes of ruling on those motions. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). For the purposes of the parties' cross-motions for summary judgment, to the extent there are disputed issues of material fact, the Court considers as much in ruling on those motions and views the evidence in the light most favorable to the nonmovant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

2

contract. (Id.). The OPTN controls the selection of patients for receipt of donor kidneys. (Doc. No. 1 ¶ 33; Doc. No. 92-1 at Ex. S).

To be placed on the waitlist, a patient must visit a transplant hospital and receive a referral from their physician. (Doc. No. 1 ¶ 28). Transplant hospitals, like VUMC, consider various factors in determining whether to refer a patient for registration on the waitlist. (Doc. No. 112-1 ¶ 2). Generally, for a physician at a transplant hospital to find that a patient qualifies for registration to the waitlist, a patient's kidney function score must either fall below 20 milliliters per minute ("mL/min."), or the patient must begin dialysis.[4] (Doc. No. 1 ¶ 32; Doc. No. 110 ¶ 17). The kidney function score can be expressed through different metrics, including eGFR, creatinine clearance ("CrCl"), or measured GFR. (Doc. No. 110 ¶ 18).

When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR scores if applicable, into a software called UNet. (Doc. No. 1 ¶ 29). UNet is owned and managed by UNOS, pursuant to OPTN policy. (Id.; Doc. No. 110 ¶ 15). Once a referring hospital registers a patient to the waitlist, UNet then tracks the patient's medical information and wait time. (Doc. No. 1 ¶ 29). OPTN Policy 8.3, in relevant part, dictates how wait time is calculated:

> If a kidney candidate is 18 years or older on the date the candidate is registered for a kidney, then the candidate's waiting time is based on the earliest of the following:
>
> > 1. The candidate's registration date with a glomerular filtration rate (GFR) or measured or estimated creatinine clearance (CrCl) less than or equal to 20 mL/min.
> >
> > 2. The date after registration that a candidate's GFR or measured or estimated CrCl becomes less than or equal to 20 mL/min.

---

[4] "Kidney function" is a measure that refers to how much blood an individual's kidneys can filter in one minute. A kidney function score below 20 mL/min. is a measurement that indicates very poor kidney filtering ability, indicating severe kidney failure. Further, patients often begin dialysis as a treatment when their kidneys no longer work effectively.

3

3. The date that the candidate began regularly administered dialysis as an End Stage Renal Disease (ESRD) patient in a hospital based, independent non-hospital based, or home setting.

(Doc. No. 95-30 at 5). Qualifying waitlist members who have been registered on the waitlist receive points in their kidney allocation score, including 1/365 of a point for each day of qualifying wait time on the waitlist. (Doc. No. 110 ¶ 16). Each time a donor kidney becomes available, UNet's algorithm considers the information maintained within UNet, generates a list of potential matches, and ranks waitlist members by kidney allocation score as set forth in OPTN policy ("match runs"). (Doc. No. 1 ¶ 30; Doc. No. 110 ¶ 15). Kidneys are then offered to patients through the transplant hospitals in accordance with the UNet-generated rankings.[5] (Doc. No. 1 ¶ 30). The primary factor considered by UNet's algorithm in ranking candidates for compatible kidneys is the patient's accrued wait time. (Id. ¶ 31).

For years, transplant hospitals used a race-based coefficient, "eGFR AA," to estimate Black kidney transplant candidates' eGFR values, which Welch contends reduces their eligibility for transplants. (Doc. No. 110 ¶ 32). The race-based coefficient, as applied, artificially inflates a Black patient's eGFR value by multiplying the eGFR value by 1.21. (Doc. No. 1 ¶ 34; Doc. No. 95-38 at 27; Doc. No. 95-31 ¶¶ 41–42).[6] The use of the race-based coefficient, for Black patients, even when their unadjusted eGFR score fell below 20 mL/min, artificially inflated the Black patients' eGFR scores. (Doc. No. 1 ¶ 35). This race-based coefficient was applied by hospitals

---

[5] The parties dispute the validity of this statement. While Welch maintains that this is how kidneys are assigned to patients in need, Defendants contend that "[t]he rank order within which kidneys are offered to candidates is far from absolute," and "exceptions do occur" such that "[i]n such situations the rank order on a match run essentially becomes irrelevant." (Doc. No. 112-1 ¶ 6).

[6] Unless otherwise stated, the Court's opinion will refer to exhibits by page number, rather than PageID.

4

like VUMC, and used by UNOS in UNet, relied upon the now-debunked science that Black individuals have greater muscle mass than White individuals, and naturally have more creatinine in their system.  (Id. ¶¶ 34, 71).

Years ago, evidence began emerging that this race-based coefficient was not based in scientific fact.  (Id. ¶¶ 39–40; Doc. No. 112-1 ¶ 13).  For example, in November 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned the practice of using the race-based coefficient on Black patients' eGFR values.  (Doc. No. 1 ¶ 40).  Further, another article in 2021 entitled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Functions Estimating Equations* stated that the race-based coefficient has "not been substantiated by rigorous scientific evidence[.]"  (Id. ¶ 39).  Nevertheless, Defendants' use of race-based coefficient persisted.  (Id. ¶¶ 40, 41, 45).

In June 2020, UNOS acknowledged the racial inequity in the kidney transplant system, but failed to address the widespread use of the race-based coefficient.  (Id. ¶ 45).  It was not until June 2022 that UNOS stated in a press release:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black.  This practice has led to a systemic underestimation of kidney disease severity for many Black patients.  Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.

(Id. ¶ 12; Doc. No. 110 ¶ 63).  It also posted the following on the "issues with the race variable in eGFR:"

> [e]GFR calculations rely on a binary approach to race.  When the race variable is used in formulas, eGFR calculators offer two response options: "Black" or "Not Black."
>
> These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population.  The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

(Doc. No. 1 ¶ 46).

Even after releasing these statements, the OPTN's policy on the race-based coefficient did not change until July 27, 2022. (Id. ¶ 47; Doc. No. 110 ¶ 64; Doc. No. 112-1 ¶ 16). Then, UNOS announced a revision to OPTN policy, prohibiting transplant hospitals from submitting eGFR scores that had been adjusted based on the respective patient's race. (Doc. No. 110 ¶ 64; Doc. No. 95-65 at 2 ("Transplant hospitals are now required to use only race-neutral eGFR formulas for data entered into UNet.")). Nevertheless, UNOS and transplant hospitals, including VUMC, continued to use the race-based coefficient as a default. (Doc. No. 1 ¶¶ 1, 48; Doc. No. 110 ¶ 20). Finally, in January 2023, UNOS announced a new OPTN policy that required transplant hospitals to notify potentially affected Black patients of the use of the race-based coefficient. (Doc. No. 110 ¶ 65; Doc. No. 95-66 at 2 ("A new policy action now in effect means some Black kidney candidates will be eligible to receive waiting time modifications and increase their waiting times.")). To that end, OPTN policy required transplant hospitals to "backdate the waiting times of those Black kidney transplant candidates who were disadvantaged by previous use of a race-inclusive calculation to estimate their level of kidney function" ("wait time adjustment"). (Doc. No. 110 ¶ 65; Doc. No. 95-66 at 3).

For a Black kidney transplant candidate to qualify for a wait time adjustment, UNOS announced that OPTN policy would require documentation from the transplant hospital. This documentation must include where and when a respective Black patient was registered on the waitlist, "demonstrating that with a race-inclusive calculation, the candidate's eGFR was over 20 mL/min., but with a race-neutral calculation it would have been 20 mL/min. or less." (Doc. No. 110 ¶ 66). UNOS gave donor hospitals a year to complete this process. (Id. ¶ 65; Doc. No. 95-66 at 5 ("Programs are required to complete the process by Jan. 3, 2024, although modifications are

6

permitted at any time in the future.")).  However, as of January 15, 2024, only 14,849 wait time adjustments had been processed, despite 27,500 Black kidney transplant candidates being in UNet's system.  (Doc. No. 1 ¶ 51).

Welch, a Black man who is a patient at VUMC, was diagnosed with kidney disease in 2010.  (Doc. No. 1 ¶ 5; Doc. No. 110 ¶ 1).  Welch's kidney disease progressed such that by 2018, he began dialysis.  (Doc. No. 1 ¶ 5; Doc. No. 110 ¶ 34).  By July 2019, VUMC began taking steps to register Welch for the national kidney transplant waitlist.  (Doc. No. 1 ¶ 14; Doc. No. 112-1 ¶ 27).  When VUMC registered Welch to the waitlist, his registration was backdated to April 24, 2018—the day Welch began regularly administered dialysis.[7]  (Doc. No. 112-1 ¶ 29).  VUMC never registered Welch on the waitlist based on a qualifying eGFR score prior to his registration in 2019.  (Doc. No. 110 ¶ 34).  In October 2022, due to Welch's poor condition, VUMC changed his status to "inactive" on the waitlist.  (Doc. No. 1 ¶ 16; Doc. No. 110 ¶¶ 72).  Because Welch is listed as "inactive" in UNet, he was no longer eligible to receive a kidney.  (Doc. No. 1 ¶ 16; Doc. No. 110 ¶¶ 71–72).

In late 2023, VUMC identified one of Welch's medical records dated September 11, 2011, that reflected an eGFR result of 23 mL/min. with the race-based coefficient applied, and 19 mL/min. with a race-neutral calculation.  (Doc. No. 112-1 ¶ 30; see Doc. No. 1 ¶ 14).  VUMC provided that wait time adjustment documentation to UNOS, which modified Welch's wait time accrual by 2,417 days, and increased his kidney allocation score by 6.62 points.  (Doc. No. 110 ¶

---

[7] The Complaint alleges that VUMC registered Welch for the waitlist in 2018.  (Doc. No. 1 ¶ 14). Discovery has revealed that VUMC added Welch to the waitlist in 2019, but backdated his registration to the day he started dialysis.  (Doc. No. 112-1 ¶ 29).  For the purposes of Defendants' motions to dismiss, the Court will only consider the 2018 date for registration that is alleged in the Complaint.

70; Doc. No. 112-1 ¶ 31). In December 2023, almost a year after UNOS announced it would provide wait time adjustments for Black kidney transplant candidates in UNet, Welch's surgeon informed Welch that, pursuant to UNOS's policy change, he was entitled to the 2,417 days of wait time adjustment on the waitlist (the equivalent of approximately 6.6 years of his life). (Id.; Doc. No. 1 ¶ 14).

## II.    DEFENDANTS' MOTIONS TO DISMISS

UNOS's and VUMC's motions to dismiss are ripe for decision. (Doc. Nos. 21, 23). UNOS argues the claims against it warrant dismissal on both Rule 12(b)(1) and 12(b)(6) grounds.[8] (Doc. No. 21). VUMC contends that the claims against it warrant dismissal on only Rule 12(b)(6) grounds. (Doc. No. 23). The Court will first address UNOS's Rule 12(b)(1) argument, followed by Defendants' various Rule 12(b)(6) arguments.

### A.    Subject Matter Jurisdiction

UNOS first argues that Welch's request for injunctive relief should be dismissed because he does not have standing to seek such relief. (Doc. No. 22 at 17–18).

#### 1.    Legal Standard

"When a motion [to dismiss] is based on more than one ground, the court should consider the Rule 12(b)(1) challenge first since, if it must dismiss the complaint for lack of subject matter jurisdiction, the other defenses and objections become moot and need not be determined." Mich. State Emps. Ass'n v. Marlan, 608 F. Supp. 85, 87 (W.D. Mich. 1984); see also Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990). "[W]here subject matter

---

[8] UNOS attaches two public sources to its motion to dismiss (Doc. Nos. 22-1, 22-2), which are public materials that are judicially noticeable. Armengau v. Cline, 7 F. App'x 336, 344 (6th Cir. 2001) ("documents attached to a motion to dismiss" that are "referred to in a complaint and [are] central to the claim," and "public records" are "matters of which a court may take judicial notice"). The Court will consider such materials in resolving UNOS's motion.

8

jurisdiction is challenged under Rule 12(b)(1)," as UNOS does here, "the *plaintiff* has the burden of proving jurisdiction in order to survive the motion." Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986); see Abbot v. Michigan, 474 F.3d 324, 328 (6th Cir. 2007).

"A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." Cartwright v. Garner, 751 F.3d 752, 759 (6th Cir. 2014) (citing United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994)). A facial attack goes to whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of the Rule 12(b)(1) analysis. Ritchie, 15 F.3d at 598. A factual attack challenges the factual existence of subject matter jurisdiction. Id. In the case of a factual attack, the Court has broad discretion on what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings. Id. The Court may weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. Id. Here, UNOS makes a facial challenge, so the Court limits its consideration to the allegations of the Complaint and assumes them to be true. (Doc. No. 22 at 17–18).

A motion to dismiss for lack of standing is properly characterized as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). See Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008) (referring to a "lack of standing" as a "lack of subject matter jurisdiction"). "[T]he irreducible constitutional minimum of standing contains three elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (internal citations omitted). The

9

plaintiff has the burden of satisfying all three prongs "separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000).

    2.  <u>Analysis</u>

Welch requests "preliminary and permanent injunctions enjoining and restraining UNOS and VUMC, their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of, or in concert with UNOS or VUMC, from engaging in" the racial discrimination alleged in the Complaint. (Doc. No. 1 at Prayer for Relief ¶ 1). UNOS contends that Welch fails to allege any facts "establishing that the alleged racial discrimination is ongoing" to establish standing for injunctive relief, because the race-based coefficient is no longer in use. (Doc. No. 22 at 18). Welch counters that his injury is ongoing, in that he "may die if he does not receive the life-saving kidney that he has been deprived of[.]" (Doc. No. 33 at 25). The third prong of standing, redressability, is dispositive on this dispute between Welch and UNOS. To satisfy the redressability prong of standing on Welch's request for injunctive relief, Welch must allege that a favorable decision would address his injury. <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990).

Here, the Court agrees with UNOS that Welch has not sufficiently alleged redressability to have standing to seek injunctive relief. True, Welch has alleged an ongoing injury that is resultant of the Defendants' use of the race-based coefficient—his continuing kidney and heart disease. (Doc. No. 1 ¶¶ 1–2, 11, 58, 60–62). However, Welch fails to plausibly allege facts demonstrating that granting Welch injunctive relief would remedy his injuries. Welch requests injunctive relief enjoining Defendants from engaging in the racial discrimination alleged in the Complaint, i.e., use of the race-based coefficient. (Doc. No. 1 at Prayer for Relief ¶ 1). However, as UNOS emphasizes, Welch also alleges that Defendants no longer use the race-based coefficient in

10

calculating eGFR values for Black patients. (Id. ¶¶ 13, 49 (use of the race-based coefficient concluded in January 2023)). While Welch alleges that some Black patients still have not received their wait time adjustment and are technically still subject to the use of the race-based coefficient, (id. ¶ 51), he is not one of those patients (id. ¶ 14 (alleging Welch received a seven-year wait time adjustment in December 2023)). Further, Welch is no longer active on the waitlist, given his current medical condition. (Id. ¶ 16).

Viewing these allegations as true and in Welch's favor, the Complaint is devoid of any allegations demonstrating that granting Welch injunctive relief would have any impact on his current condition. Welch's allegations that his treatment is no longer subject to the race-based coefficient (id. ¶ 14) and that he has been deemed inactive on the waitlist (id. ¶ 16) are dispositive here. And Welch cannot base his request for injunctive relief on other Black patients who may not have adjusted wait times. See Duke Power Co. v. Carolina Env't. Study Grp., Inc., 438 U.S. 59, 80 (1978) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (internal citation and quotations omitted). Ultimately, even if the Court were to enter the injunction Welch seeks, it would not address Welch's ongoing health issues because he has already received his adjusted wait time to remedy the use of the race-based coefficient, and he is not currently eligible for a kidney donation. Whitmore, 495 U.S. at 155. Accordingly, UNOS's motion will be granted on Welch's request for injunctive relief. Welch's request for injunctive relief will be dismissed in its entirety.[9]

---

[9] VUMC did not move to dismiss on this ground. (Doc. Nos. 23, 24). However, this Court has "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009) (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986)). Because the Court independently finds

11

B.  <u>Failure to State a Claim</u>

Defendants also raise various reasons they contend the Complaint warrants dismissal under Rule 12(b)(6).[10]

1.  <u>Legal Standard</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Fed. R. Civ. P. 8(a)(2)). When determining whether the Complaint meets this standard, the Court accepts all the Complaint's factual allegations as true, draw all reasonable inferences in Welch's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). The Court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether Welch can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). And "[w]hile the complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions" or "a formulaic recitation of a cause of action's elements[.]" Blackwell, 979 F.3d at 524 (internal quotations omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Moreover, in evaluating a motion to dismiss, the Court may consider the Complaint and the exhibits attached. Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008).

---

Welch does not have standing to seek injunctive relief here, it must dismiss Welch's request for such relief irrespective of whether VUMC moved the Court to do so. See id.

[10] In addressing Defendants' Rule 12(b)(6) arguments, for the sake of efficiency, the Court refers to the applicable legal standards for each claim that described in Section III of its opinion.

12

2. <u>Analysis</u>

Defendants contend Welch fails to plausibly allege all his claims. UNOS argues Welch's claims warrant dismissal because: (1) Welch's Title VI claim fails because he does not plausibly allege that UNOS receives Federal financial assistance, and he alleges no actionable discrimination by UNOS; and (2) Welch's claims are time-barred. (Doc. No. 22 at 9–17). VUMC argues dismissal is warranted because: (1) again, Welch fails to sufficiently allege intentional discrimination; (2) again, Welch's claims are time-barred; (3) Welch fails to state a breach of fiduciary duty claim; and (4) Welch fails to state a THRA claim against VUMC. (Doc. No. 24 at 6–16). Because Defendants' remaining arguments are unsuccessful, the Court need not spend a great deal of time addressing them. The Court will consider each argument briefly, and together to the extent they overlap.

a. <u>Welch Has Sufficiently Alleged UNOS Receives Federal Financial Assistance.</u>

UNOS first argues that Welch's Title VI claim fails because Welch does not allege that it receives "Federal financial assistance," as is required for a Title VI claim. (Doc. No. 22 at 10–11). In support, UNOS argues that the Complaint alleges UNOS provides services pursuant to a contract with the federal government, which demonstrates that it does not receive a subsidy qualifying as "Federal financial assistance" under Title VI. (<u>Id.</u>). Welch contests this, arguing that he has sufficiently pled that UNOS receives "Federal financial assistance" under Title VI, and any factual issues on the nature of that assistance are best resolved after discovery. (Doc. No. 33 at 13–15). As discussed below, see <u>u</u>, Section III.B.1.a, the parties are correct that Welch must allege UNOS receives "Federal financial assistance" to sufficiently allege his Title VI claim.

Here, the Court agrees with Welch that he sufficiently alleges UNOS receives Federal financial assistance at pleading stage. UNOS argues it is "a matter of public record that UNOS is

13

a government contractor," and cites to various website links discussing UNOS's "contract" with the federal government.[11]  (Doc. No. 22 at 10).  Still, UNOS chose not to introduce the pertinent contract at issue for the Court's consideration.  See Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997), rev'd on other grounds by Swierkiwica v. Sorema N.A., 534 U.S. 506 (2002) ("[A] defendant may introduce certain pertinent documents if the plaintiff fails to do so.").  In failing to do so, UNOS ran the risk that Welch's purportedly "legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied."  Weiner, 108 F.3d at 89.

UNOS's failure to attach the operative document is at its own peril. The Court accepts as true that "[a]pproximately 10% of UNOS's budget is provided by the Federal government" under "contracts [that] were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government[.]"  (Doc. No. 1 ¶ 68).  These allegations plausibly fall within the ambit of what constitutes "Federal financial assistance" under Title VI.  45 C.F.R. § 80.13(f) (2004) (defining "Federal financial assistance" as including grants, loans, and certain types of contracts).  At this stage, taking these allegations as true, they are sufficient to allege that UNOS receives "Federal financial assistance" under Title VI.

### b.  Welch's Claims Are Not Time Barred.

Defendants both argue that all of Welch's claims are time barred because the Complaint fails to allege that Welch was unaware of the application of a race-based coefficient to his eGFR measure more than a year before he asserted his claims.  (Doc. No. 22 at 13; Doc. No. 24 at 6).

---

[11] In support, UNOS again cites to sources outside of the Complaint.  The Court finds the first public source judicially noticeable and considers it accordingly.  See Armengau, 7 F. App'x at 344.  However, the Court does not consider the other two sources UNOS cites to because the website links are inactive.

Further, Defendants contend Welch should have known about the use of the race-based coefficient many years ago due to his addition to the waitlist in 2018. (See id.). Welch disagrees, emphasizing that the Complaint alleges he was not informed of the use of the race-based coefficient until December 2023. Further, Defendants' arguments that he should have known about the coefficient sooner have already been rejected in another district court case with similar factual circumstances, Randall v. United Network for Organ Sharing, 720 F. Supp. 3d 864, 877–78 (C.D. Cal. 2024). (Doc. No. 33 at 20; Doc. No. 34 at 10).

While Randall is not binding on this court, the factual similarities between it and the present case make it persuasive authority here. Randall involves a punitive class action complaint against UNOS and Cedar-Sinai Medical Center ("Cedar-Sinai"), alleging Title VI, unfair competition law, and breach of fiduciary duty claims arising from the use of the race-based coefficient at issue in this case. Randall, 720 F. Supp. 3d at 871–73. There, the Randall court rejected UNOS's argument that the claims at issue were barred by the applicable statutes of limitations because Randall "knew or had reason to know" that the injury, i.e., the delay in accruing wait time on the waitlist, occurred. Id. at 877. The Randall court, understandably, found "UNOS's argument [] unavailing, particularly in the context of a "wait" list, which necessarily involves waiting and delay." Id. While these cases are not the same, in that they implicate some different claims, state law, and statutes of limitations, the reasoning in Randall is equally applicable here.

All of Welch's claims are subject to a one-year statute of limitations. See Lillard v. Shelby Cnty. Bd. of Educ., 76 F.3d 716, 729 (6th Cir. 1996) ("The great weight of authority" favors "applying, in this case, the Tennessee statute of limitations for personal injury claims" to Title VI claims.); Whaley v. Perkins, 197 S.W.3d 665, 670–71 (Tenn. 2006) (one-year statute of limitations applies to personal injury claims); Tenn. Code Ann. § 4–21–311(d) ("A civil cause of action under

15

this section shall be filed. . . within one (1) year after the alleged discriminatory practice ceases[.]"); Tenn. Code. Ann. § 28–3–104(a)(1)(A) (statute of limitations for tort actions for personal injuries is one year). Under both federal and Tennessee law, pursuant to the discovery rule, the statute of limitations on a cause of action does not begin to run until the "reasonable person knows, or in the existence of due diligence should have known, both his injury and the cause of that injury." Campbell v. Grand Trunk W. R.R. Co., 238 F.3d 772, 775 (6th Cir. 2001); see Carvell v. Bottoms, 900 S.W.2d 23, 29 (Tenn. 1995) (Tennessee statute of limitations begins to run when plaintiff has actual knowledge of the facts sufficient to put a reasonable person on notice that he suffered an injury as a result of the wrongful conduct).

Here, the statute of limitations on Welch's claims did not begin to run until December 2023. The Complaint alleges that in 2018, Welch was put on the national kidney transplant waitlist when he started dialysis, and knew then that he was accruing wait time.[12] (Doc. No. 1 ¶ 55). But it was not until December 2023 when he finally became aware that his race affected his position on the waitlist, when his surgeon informed him of the use of the race-based coefficient. (Id. ¶¶ 14, 40 n.3). Contrary to Defendants' assertions, the Complaint affirmatively alleges Welch had no knowledge of the use of the race-based coefficient until the day he was informed of his wait time adjustment. (Doc. No. 1 ¶ 40 n.3 ("To be clear, Mr. Welch was unaware of this article, and Mr. Welch was further unaware that his race affected his position on the waitlist until December of 2023.")). Viewing these allegations as true and in Welch's favor, the Complaint plausibly alleges that the race-based coefficient continued to impact Welch until he was informed in December 2023 that his waitlist time was adjusted to remove the use of the race-based coefficient, and that he had

---

[12] Discovery has revealed that Welch was added to the waitlist in 2019, with a backdated entry to 2018. (Doc. No. 112-1 ¶ 27). The Court will not consider such evidence at the motion to dismiss stage.

16

no reason to know of its use until that day. See <u>Chardon v. Fernandez</u>, 454 U.S. 6, 8 (1981) ("the proper focus [for a Title VI claim] is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful").

Like the district court in <u>Randall</u>, the Court is unpersuaded by Defendants' arguments that Welch reasonably should have known a race-based coefficient impacted his spot on the waitlist sooner than December 2023. UNOS contends that its "press releases and news coverage" put Welch on inquiry notice that Defendants used the race-based coefficient in calculating his wait time. Similarly, VUMC argues that Welch should have probed wrongful conduct associated with the waitlist as soon as he was put on it in 2018. (See Doc. No. 39 at 4). These arguments seek to impose an unreasonable affirmative burden on an individual on a waitlist that necessarily requires waiting and delay, <u>see</u> <u>Randall</u>, 720 F. Supp. 3d at 877, but they also incorrectly assume a reasonable person has reason to suspect that a medical care provider is motivated by illegal racial discrimination, such that they should go looking for evidence of it. The Court declines to adopt this extreme viewpoint.

Taking the allegations in the Complaint as true, Welch did not reasonably know that he had suffered an injury as to his status on the waitlist, or that the race-based coefficient caused that injury, until December 2023. Further, Welch continued to suffer from the use of that alleged discriminatory act until it no longer applied to him in December 2023, when he received his wait time adjustment. Upon learning this, Welch filed the instant suit against Defendants on April 9, 2024, roughly four months later. (See Doc. No. 1). The four-month period between Welch obtaining knowledge of Defendants' use of the race-based coefficient and his filing suit falls well within the one-year statute of limitations all of his claims are subject to. Accordingly, Welch's claims are timely.

17

c. <u>Welch Has Sufficiently Alleged Intentional Discrimination.</u>

Defendants next argue that Welch fails to sufficiently allege intentional discrimination under Title VI and the THRA. As discussed fully below, <u>see infra</u>, Sections III.B.1.b and III.B.3, to successfully plead intentional discrimination, Welch must sufficiently allege that Defendants "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 279 (1979). This standard requires Welch to allege "more than intent as volition or intent as awareness of consequences." <u>Id.</u> UNOS argues that Welch alleges "no facts establishing that UNOS had a policy to discriminate based on race," and that its OPTN Kidney Policy itself shows no such policy existed. (Doc. No. 22 at 12–13). Similarly, VUMC argues that the Complaint contains no allegations suggesting it applied the race-based coefficient due to discriminatory animus, as is required for Welch's Title VI claim. (Doc. No. 24 at 10–11).

However, an entity can be liable under Title VI if it is "deliberately indifferent to known acts" of discrimination, <u>Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.</u>, 526 U.S. 629, 641 (1999), as well as for acts of discrimination resulting from its own "official policy." <u>Gebser v. Lago Vista Independent Sch. Dist.</u>, 524 U.S. 274, 290 (1998); <u>see also infra</u>, <u>see infra</u>, Sections III.B.1.b (discussing intentional discrimination prong of Title VI claim) and III.B.3 (THRA is meant to mirror federal law). The Complaint easily satisfies this standard for both UNOS and VUMC. Welch alleges that UNOS's "policy encouraged and allowed for the use of the race-based coefficient," which Welch contends "was made to Black patients' eGFR scores entirely because of their race and was not applied to other racial groups." (Doc. No. 1 ¶ 37). In turn, Welch alleges that VUMC "appl[ied] the race-based coefficient directly" to Welch. (<u>Id.</u> ¶ 70). Welch also alleges that Defendants inputted and used this race-based coefficient "knowingly," "result[ing] in non-

18

Black patients receiving numerous kidneys that would otherwise have been given to Black applicants had their wait times been calculated without consideration of race." (Id. ¶¶ 43, 85). Further, Welch alleges that Defendants knew or should have known that using the race-based coefficient was not substantiated by rigorous evidence, given the critiques of its use in the medical community. (Id. ¶¶ 39–41).

These allegations, taken as true and in Welch's favor, sufficiently establish that Defendants at worst caused and knew of, and at best were deliberately indifferent to, known discrimination through use of the race-based coefficient. Accordingly, Welch has sufficiently pled intentional discrimination for his Title VI and THRA claims.

> d. Welch Has Stated a Breach of Fiduciary Duty Claim Against VUMC.

Next, VUMC argues that Welch's breach of fiduciary duty claim fails because Welch does not "adequately allege a breach of that relationship[,]" in that "[a]ll [VUMC] did was apply an accepted medical standard for patients with kidney disease in good faith and in accordance with UNOS policy." (Doc. No. 24 at 13). Welch disagrees, arguing that he sufficiently alleges that "no one at VUMC disclosed" to him the use of the race-based coefficient in a timely fashion, nor did VUMC act in his best interest by disadvantaging him for donor kidneys. (Doc. No. 34 at 22).

The Court finds that Welch has sufficiently alleged a breach of the fiduciary duty by VUMC. Welch formed a fiduciary relationship with VUMC when he entrusted VUMC with "his life and his personal medical information," "relied upon" VUMC to "act as agent in the donor kidney marketplace," and "relied on" VUMC "to use its best efforts" to obtain a kidney for him. (Doc. No. 1 ¶ 76). From this, the Court can easily draw a reasonable inference that Welch entrusted both VUMC, and its doctors and staff, to properly handle his medical information and his waitlist status. Welch further alleges VUMC (and by inference its employees), breached its fiduciary duty

to him when it "knowingly submit[ed] eGFR scores for Mr. Welch that were tainted by use of the race-based coefficient" and "failed for approximately another year to recalculate Mr. Welch's wait time." (Id. ¶ 77). Welch sufficiently alleges he was "unaware that his race affected his position on the waitlist until December 2023," creating a plausible inference that no one at VUMC told him as much before then. (Id. ¶ 40 n.3). As a result of VUMC's breaches, the Complaint states that Welch was deprived of, or was delayed, in receiving a donor kidney. (Id. ¶ 78).

Under such circumstances, taking these allegations as true and in Welch's favor, Welch plausibly alleges that VUMC could be liable through a theory of respondeat superior for the fiduciary breaches of its employees. See infra, Section III.B.2. Welch certainly sufficiently alleges that VUMC and its employees did not act in his best interests, as VUMC and its providers did not inform Welch of the use of the race-based coefficient, nor did they promptly inform him of an adjusted waitlist time.[13] See Shadrick v. Coker, 963 S.W.2d 726, 736 (Tenn. 1998) (fiduciary duty creates a duty to disclose in the context of a doctor-patient relationship, given "[o]nce the relationship exists," there "exists a duty to speak") (internal citation and quotations omitted); see also Randall, 720 F. Supp. 3d at 885 (Black kidney transplant candidate plausibly alleged that Cedar Sinai could be held vicariously liable for its doctors' breaches of fiduciary duty in their failure to disclose the use of the same race-based coefficient at issue here).

As the court in Randall opined, undoubtedly, "more facts are needed to determine whether a claim will actually lie against" VUMC on this theory of liability. See Randall, 720 F. Supp. 3d

---

[13] VUMC contends that the Complaint does not allege that VUMC breached its fiduciary duty by failing to disclose information. (Doc. No. 24 at 12–13). While VUMC is correct that Welch does not actually state as much (Doc. No. 1 ¶ 77), the Court finds this to be a plausible inference based on the allegations in the Complaint. Because the Court finds Welch plausibly alleges VUMC failed to disclose pertinent information to him, the Court need not address the parties' other arguments on the proper scope of the alleged fiduciary duty at issue.

20

at 885 (denying Cedar-Sinai's motion to dismiss breach of fiduciary duty claim). But at this stage, drawing all inferences in favor of Welch, he has alleged that VUMC may be liable for a breach of fiduciary duty that one of its doctors or other employees owed to Welch. See id.

### e. Welch Has Sufficiently Stated a THRA Claim Against VUMC.

Finally, VUMC argues Welch has not sufficiently alleged his THRA public accommodation discrimination claim. To establish a prima facie case for a violation of the THRA's public accommodation provision, Tenn. Code Ann. § 4–21–501, Welch must plead facts plausibly alleging:

> (1) that the plaintiff is a member of a protected class; (2) that the defendant operated a place of public accommodation; and (3) that the plaintiff has been denied access to the defendant's place of public accommodation. In establishing the denial-of-access requirement, the plaintiff may also show that he was subjected to disparate treatment and that the disparate treatment had the effect of deterring access.

Phillips v. Interstate Hotels Corp. No. L07, 974 S.W.2d 680, 684 (Tenn. 1998). Under Tennessee law, a "public accommodation" is defined as, in relevant part:

> [A]ny place, store or other establishment, either licensed or unlicensed, that supplies goods or services to the general public or that solicits or accepts the patronage or trade of the general public, or that is supported directly or indirectly by government funds[.]

Tenn. Code Ann. § 4–21–102(15). VUMC challenges only the second and third elements of Welch's THRA claim, arguing that Welch fails to properly allege that he was denied access in a place of public accommodation. (Doc. No. 24 at 14–15). Welch disagrees because he has pled that VUMC hospital is a place of public accommodation, and that he was "denied access to a life-saving kidney transplant at VUMC's transplant hospital because he is Black." (Doc. No. 34 at 23–25). While scant, the Court finds Welch's allegations sufficient to survive the pleading stage.

Viewing the Complaint in Welch's favor, he has alleged facts sufficiently demonstrating that VUMC is a place of public accommodation, and Welch was denied access to services there.

21

First, Welch alleges that VUMC is a "transplant hospital[]," which is "a place of public accommodation." (Doc. No. 1 ¶¶ 28, 82). Further, Welch alleges that VUMC provides both "patient care and other related operations," (id. ¶ 69), demonstrating it is a "place" that supplies "services" to the general public for the purposes of the THRA. See Tenn. Code Ann. § 4–21–102(15). Next, Welch alleges that at VUMC, he was "denied full and fair access" because VUMC secretly applied the race-based coefficient to "artificially inflate Black patients' eGFR scores," delaying Mr. Welch's accrual of wait time and prejudicing his chance to receive a donor kidney. (Id. ¶¶ 28, 82, 84). These facts, taken together, sufficiently establish that Welch was denied a service VUMC provides—its medical system and associated care. These allegations, taken as true and in Welch's favor, establish that he has sufficiently pled his THRA public accommodation discrimination claim.

## III. THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

The Court now turns to the parties' cross-motions for summary judgment. (Doc. Nos. 86, 95).

### A. Legal Standard

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element

22

of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. See Rodgers, 344 F.3d at 595.

B. Analysis

Defendants move for summary judgment on each of Welch's three claims. (Doc. No. 91). Welch does the same, but only on liability.[14] (Doc. No. 94 at 4). For efficiency, the Court will address the parties' respective motions together.

1. Title VI

All parties contend they are entitled to summary judgment on Welch's Title VI discrimination claim. Defendants contend that Welch cannot establish they intentionally discriminated against him, nor can he establish "but for" causation. (Doc. No. 91 at 19, 24). Further, UNOS contends Welch cannot establish that UNOS receives "Federal financial

---

[14] As Defendants repeatedly note, Welch improperly filed a partial motion for summary judgment without requesting leave of Court, in violation of the Initial Case Management Order (Doc. No. 42) and this Court's Judicial Preferences. However, for the sake of judicial economy, fairness, and given the unique nature of this case, the Court will consider Welch's motion.

assistance," as required under Title VI. (Id. at 27). Welch disputes these arguments and asserts that he has shown there is no dispute of material fact that Defendants intentionally discriminated against him. (Doc. No. 94 at 17–23). The Court will consider each argument in turn.

Title VI states, in relevant part,

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Title VI provides a private cause of action for injunctive relief and damages, M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ., 1 F.4th 436, 453 (6th Cir. 2021), but only for *intentional* discrimination. Alexander v. Sandoval, 532 U.S. 275, 279 (2001). To establish a Title VI claim, Welch must "first prove the threshold requirement that the program from which [he] was excluded receives Federal financial assistance." Buchanan v. City of Bolivar, Tenn., 99 F.3d 1352, 1357 (6th Cir. 1996). Then, Welch must establish that Defendants "intended to discriminate on the basis of race[,]" in that the decision to exclude Welch from a federally financed program "was motivated by race and that his race was a determining factor in the exclusion." Id. Finally, Welch must show causation to make his Title VI claim. See Kollaritsch v. Michigan State Univ. Bd. of Trustees, 944 F.3d 613, 621 (6th Cir. 2019) (applying causation element to Title VI deliberate indifference discrimination claim); Peters v. Jenney, 327 F.3d 307, 321 n. 15 (4th Cir. 2003) (stating that the McDonnell Douglas framework does not alter the elements of a Title VI claim, only the manner in which a plaintiff can prove causation); Caulker v. Michigan State Univ., 2009 WL 3644778, at *5 (W.D. Mich. Nov. 2, 2009) (applying Peters).

a. Federal Financial Assistance

The Court first turns to the threshold requirement for Welch's Title VI claim, that Defendants receive "Federal financial assistance." Buchanan, 99 F.3d at 1357. The Court starts with UNOS's motion. UNOS contends it is entitled to summary judgment on this element alone,

24

as it provides its services "pursuant to a federal procurement cont[r]act with the federal government," which does not constitute "Federal financial assistance" under Title VI. (Doc. No. 91 at 27–28). Welch disagrees, asserting that Congress intended to provide "Federal financial assistance" to UNOS, not to "purchase anything for the government's benefit." (Doc. No. 113 at 21).

The natural starting point to determine what constitutes "Federal financial assistance" under Title VI is the statutory language. United States ex rel. Felten v. William Beaumont Hosp., 993 F.3d 428, 431 (6th Cir. 2021) (when interpreting the meaning of a statute, "start with the statutory text"). However, the term "Federal financial assistance," as referenced in Title VI, is not defined by Congress. This requires the Court to look to the federal regulations implementing Title VI, relevant legal authority, and Title VI's legislative history to provide guidance. See Brilliance Audio, Inc. v. Haights Cross Comms., Inc., 474 F.3d 465, 371 (6th Cir. 2007) ("Only if the statute is 'inescapably ambiguous' should a court look to other persuasive authority in an attempt to discern legislative meaning. Persuasive authority can include other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed.").

The federal regulations provide a helpful starting point. Under the regulations, "Federal financial assistance" under Title VI includes:

> (1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.

25

45 C.F.R. § 80.13(f) (2004). Giving these terms their plain meanings, only a contract that "has as one of its purposes the provision of assistance" constitutes "Federal financial assistance" under Title VI. See United States ex rel. Felten, 993 F.3d at 431 (interpret language using term's plain meaning). However, the parties do not cite to, nor is the Court aware of, any Sixth Circuit authority confirming what sort of contracts constitute "Federal financial assistance," or what demonstrates a "purpose[] of provision of assistance." See 45 C.F.R. § 80.13(f) (2004). This absence of authority requires the Court to look to other Circuits and district courts' interpretations of "Federal financial assistance" for guidance. In doing so, it is evident that many courts have interpreted this term to not "extend to entities receiving contractual payments made by the federal government in exchange for services[,]" Estate of Boyland v. Young, 242 F. Supp. 3d 24, 28 (D.D.C. 2017), as is consistent with the regulations' instruction that a contract is only for "Federal financial assistance" when it states as much. See 45 C.F.R. § 80.13(f) (2004).

While authority on Title VI's scope of "Federal financial assistance" is lacking, various Circuits and district courts that have analyzed the scope of the term "Federal financial assistance" in an analogous provision of the Rehabilitation Act, 29 U.S.C. § 704.[15] In interpreting the "Federal financial assistance" provision of the Rehabilitation Act, courts have concluded that in order to establish "Federal financial assistance," there must be evidence (or, at the motion to dismiss stage, allegations), that the private entity sued received a subsidy, rather than compensation from the government. See, e.g., DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 911 F.2d 1377, 1382 (10th Cir. 1990) ("'[I]n determining which programs are subject to the civil rights laws courts

_____

[15] The Rehabilitation Act provides that "[n]o qualified individual with a disability in the United States. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity *receiving Federal financial assistance* or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 704 (emphasis added).

26

should not focus on market value but on the intention of the government' to give a subsidy, as opposed to government intent to provide compensation.") (quoting Jacobson v. Delta Airlines, Inc., 742 F.2d 1202, 1210 (9th Cir. 1984)); Shotz v. Am. Airlines, Inc., 420 F.3d 1332, 1335 (11th Cir. 2005) (same); see also Lee v. Corrections Corp. of Am., 61 F. Supp. 3d 139, 144 (D.D.C. 2014) ("Courts. . . have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided"); Abdus–Sabur v. Hope Village, Inc., 221 F. Supp. 3d 3, 9 (D.D.C. 2016) (same). This rationale is instructive in the Title VI context, as evidenced by at least two other district courts outside of this Circuit applying this subsidy analysis to Title VI claims. See Estate of Boyland, 242 F. Supp. 3d at 29 (dismissing Title VI claim where plaintiffs did not allege facts establishing that private entity "receives a subsidy, or anything other than mere compensation, for its services"); Jarno v. Lewis, 256 F. Supp. 2d 499, 504–05 (E.D. Va. 2003) (applying the subsidy-compensation analysis to Title VI claim, noting "the term 'Federal financial assistance' should be given its plain and ordinary meaning, that is, aid provided to assist rather than to compensate for services rendered").

The legislative history of Title VI supports the distinction between subsidies and contracts for compensation. It is evident from correspondence between executive branch officials and congressional representatives that Congress intended "Federal financial assistance" to exclude *quid pro quo* payments made pursuant to government contracts. See, e.g., Letter from Robert Kennedy, Attorney General, to Hon. John Sherman Cooper (April 29, 1964), reprinted in 110 Cong. Rec. 10075, 10076 (1964) ("Title VI does not apply to procurement contracts, or to other contracts which do not involve financial assistance by the United States."); Letter from Nicholas de B. Katzenbach, Deputy Attorney General, to Hon. Emanuel Celler, Chairman, Committee on

the Judiciary, House of Representatives (December 2, 1963), reprinted in 110 Cong. Rec. 13380 (1964) (same). This correspondence, while not dispositive, reflects that Congress did not intend to include government contractors receiving payments for services within Title VI's liability scheme.

Considering the text of the regulations implementing Title VI, the statute's legislative history, and legal authority interpreting the definition of "Federal financial assistance" under Title VI and the analogous provision in the Rehabilitation Act, it is evident that UNOS's government contract with the United States Department of Health and Human Services ("HHS") is not "Federal financial assistance" for the purpose of Title VI. (See Doc. No. 92-1 at 1728). The Court need not look farther than the contract at issue to see that the HHS provides UNOS compensation in exchange for its management of the OPTN. (See id. at 1742 (purpose of the contract is to "conduct the operation" of the OPTN)). Indeed, the contract between UNOS and the federal government states that "supplies/services" would be provided by UNOS, in exchange for the "amount" HHS owed to UNOS for those services. (Id. at 1729). The contract further provides for the period under which UNOS is to perform, and the schedule of deliverables for that performance. (Id. at 1758). Further, while not dispositive, Welch points the Court to nothing in the contract between UNOS and HHS that requires UNOS to execute "written, executed assurances that [UNOS] will comply" with Title VI, as is customarily required to receive "Federal financial assistance" under civil rights laws, see 31 C.F.R. § 22.5(a); Shotz, 420 F.3d at 1337 (applied in the context of the Rehabilitation Act).[16]   (Doc. No. 92-1 at 1783–85 (showing contract clauses addressing general

_____

[16] 31 C.F.R. § 22.5(a) states, in pertinent part:

Either at the application stage or the award stage, federal agencies must ensure that applications for federal financial assistance or awards of federal financial assistance

28

nondiscrimination obligations (i.e., equal opportunity clauses), but no contract clause addressing Title VI obligations)).

Indeed, the statute authorizing UNOS's contract, and the legislative history interpreting that statute, demonstrate it was Congress's intent to only provide subsidies to organ procurement organizations ("OPOs"), not government contractors like UNOS. See 42 U.S.C. § 273(a) (providing for grants to only "organ procurement organizations"); DeVargas, 911 F.2d at 1382 (when determining whether civil rights law applies, courts should focus on whether the government intends to give a subsidy or compensation). UNOS receives its government contract pursuant to federal funding delegated under the National Organ Transplant Act of 1984 ("Act").[17] Pub. L. 98–507. The Act describes its purpose as:

> To provide for the establishment of the Task Force on Organ Transplantation and the Organ Procurement and Transplantation Network, to authorize financial assistance for organ procurement organizations, and for other purposes.

Id. The Act, as currently written, provides the means through which the government may fund efforts to effectuate to the Act's purposes. Specifically, the Act provides: (1) how the government

---

contain, be accompanied by, or be covered by a specifically identified assurance from the applicant or recipient, satisfactory to the designated agency official, that each program or activity operated by the applicant or recipient and to which these Title VI regulations apply *will be operated in compliance with these Title VI regulations*.

Id. (emphasis added).

[17] Following its passage in 1984, the Act has been amended at various points. Of particular note, the Act has been amended (1) under the Stephanie Tubbs Jones Organ Transplant Authorization Act of 2008 to increase funding for the OPTN from $2,000,000 to $7,000,000 (see 42 U.S.C. § 274; Pub. L. 110–426) and (2) under the Securing the U.S. Organ Procurement and Transplantation Network Act of 2023 to provide that the Secretary shall provide for the continued operation of the OPTN. 42 U.S.C. § 274(a); see Pub. L. 118–14, §2(1).

provides OPOs assistance; and (2) how the OPTN is funded and managed. Both deserve discussion here.

As to the Act's grant of financial assistance to OPOs, the Court first turns to the definition of OPOs under the Act. The Act defines an "organ procurement organization" "for which grants may be made" as, among other things, "a nonprofit entity" that has a "board of directors" composed of qualified members needed to implement the tasks of the OPTN, and is "certified or recertified by the Secretary[18] within the previous 44-year period as meeting the performance standards to be a qualified organ procurement organization."[19] 42 U.S.C. § 273(b). The Act further provides for a means to assist organizations qualifying as OPOs. Under § 273(a), the Secretary of HHS may "make grants for the planning of qualified organ procurement organizations" as well as "for the establishment, initial operation, consolidation, and expansion of qualified organ procurement organizations[.]" 42 U.S.C. § 273(a). Notably, the plain text of § 273(a) provides grants for only "organ procurement organizations." See id.; see also 42 U.S.C. § 274b(b) (describing the terms through which OPOs may receive grants).

Separately, the Act describes how it allocates funding to support the OPTN. For example, § 274(a) states:

> The Secretary shall provide for the continued operation of an Organ Procurement and Transplantation Network which meets the requirements of subsection (b). The Secretary may award *grants, contracts, or cooperative agreements*, as the Secretary determines appropriate, for purposes of carrying out this section.

---

[18] The Secretary, as defined under the Act, is the "Secretary of Health and Human Services." 42 USC § 201(c).

[19] The evidence in the record conclusively demonstrates that UNOS is not an OPO, but rather works with them. (See Doc. No. 92-1 at 349 (describing how OPOs gain access to OPTN's computer system, which is run by "OPTN's Contractor[]," UNOS)).

42 U.S.C. § 274(a) (emphasis added); see Pub. L. 118–14, §2(1). Under § 274(b), the Act states that the OPTN shall, in pertinent part:

> be operated through awards to public or private entities made by the Secretary that are distinct from the awards made to support the organization tasked with supporting the board of directors described in subparagraph (B)[.]

42 U.S.C. § 274(b)(1). Accordingly, reading the plain language of §§ 274(a) and (b) of the Act, the Act provides that the Secretary of HHS may award public or private entities, such as UNOS, awards in the form of "grants, contracts, or cooperative agreements" to assist the OPTN and the board of directors. United States ex rel. Felten, 993 F.3d at 431 ("We usually interpret a statute according to its plain meaning, without inquiry into its purpose.").

Reading the Act's provisions together, however, it is ambiguous as to whether Congress intended to provide financial assistance to just OPOs, or also to those that receive contracts pursuant to the Act under § 274. The plain language of the Act states that its purpose is, in part, to provide "financial assistance for organ procurement organizations." Pub. L. 98–507. The Act provides specific measures for how the Secretary may provide such assistance, as § 273(a) provides for specific grants that may be made to OPOs, and § 273(b) provides a definition for what constitutes an OPO receiving that "financial assistance." These clauses unambiguously demonstrate that the Act provides for: (1) a purpose to financially assist OPOs, and (2) a means through which to do it. See 42 U.S.C. §§ 273(a), (b); Pub. L. 98–507.

However, the remaining provisions of the Act are less clear on whether Congress also intended to give assistance to other public and private entities under the Act to operate and manage the OPTN. Looking at the plain text of §§ 274(a) and (b), the Act states that the Secretary of HHS may award "grants, contracts, or cooperative agreements" to "public or private entities" to operate the OPTN, or "support[] the board of directors[.]" 42 U.S.C. §§ 274(a), (b). Unlike in the case of

31

OPOs, the Act is silent on whether these "grants, contracts, or cooperative agreements" constitute "Federal financial assistance." This poses an issue when considering the regulations' definition of the term under Title VI, as that definition constitutes grants and contracts, to some extent. 45 C.F.R. § 80.13(f) (2004). Accordingly, the text of the Act does not directly answer the question of whether "contracts" under §§ 274(a) or (b) constitute "Federal financial assistance" under Title VI.

Because the Act is ambiguous as to whether it awards an entity "Federal financial assistance" under Title VI when the Secretary awards that entity a contract pursuant to §§ 274(a) or (b), the Court must look to sources outside the text for assistance. The next logical step is to turn to the Act's legislative history to determine whether Congress intended to provide assistance to entities receiving contracts to manage and operate the OPTN. See Brilliance Audio, Inc., 474 F.3d at 371 (persuasive authority in interpreting an ambiguous statute includes, among other things, legislative history) (internal citations omitted). Looking at the legislative history of the Act at the time of its enactment, it is evident that Congress only contemplated the provision of "financial assistance" to OPOs, but not to entities awarded contracts pursuant to §§ 274(a) and (b). Importantly, the Committee on Labor and Human Resources' summary of the Act notes that it defines "organ procurement organization" "solely for the purpose of [it] receiving assistance." S. Rep. 98–382 at 3976. The Committee View provides that grants for OPOs are "authorized at $5,000,000 for each of the fiscal years." S. Rep. 98–382 at 3988. Further, the Conference Agreement reflects that "Federal assistance to OPOs is intended to improve the supply of vital human organs." See H.R. Conf. Rep. 98–1127 at 3991. Absent from the legislative history is any reference indicating that such assistance should be provided to entities receiving contracts to operate the OPTN under § 274(a) and (b). See S. Rep. 98–382; H.R. Conf. Rep. 98–1127.

The Court next turns to the legislative history of the Stephanie Tubbs Jones Organ Transplant Authorization Act of 2008, which Welch relies on in support of his contention that UNOS does receive "Federal financial assistance." Welch contends the statements made by Representatives Pallone, Burgess, and Jackson-Lee shows that Congress intended to provide UNOS "Federal financial assistance" under Title VI. (Doc. No. 113 at 21). In particular, Welch points to the following representations from House Representatives:

- Representative Pallone stated that the legislation, which increased funding for the OPTN from $2,000,000 to $7,000,000, "would provide important new funding for the [OPTN]" for "critical funding to ensure the OPTN has resources it needs to continue to perform its valuable *services* to our Nation." 154 Cong. Rec. H8668-01 at H8668 (emphasis added).

- Representative Jackson-Lee stated that the bill would "take some of the burden off of the nonprofit entities that are already facing some of the toughest conditions in the sector." Id. at H8670.

- Representative Burgess supported the bill's increase of "the authorized funding for the [OPTN], which ha[d] not been increased since 1984." Id.

These statements, taken together, demonstrate only that Congress intended to "increase funding for the organ procurement and transplantation network." 154 Cong. Rec. H8668–01. In doing so, Representative Jackson-Lee stated that the increased budget would "take some of the burden off of nonprofit entities," consistent with the Act's purpose of providing assistance non-profit OPOs.[20] 42 U.S.C. § 273(b) (defining OPOs as, in part, "nonprofit" entities); 42 U.S.C. § 274b; Pub. L. 98–507. Contrary to Welch's assertion, there is no reference in the Representatives' statements to lessening the burden on contracting entities that the OPTN works with, like UNOS. See generally 154 Cong. Rec. H8668–01. Accordingly, the legislative history of the Stephanie Tubbs Jones

---

[20] True, the Act provides that non-profit entities may also receive contracts pursuant to 42 U.S.C. §§ 274(a) and (b). Nevertheless, the Court finds Representative Jackson-Lee's statement about non-profits more applicable to the sorts of non-profits, OPOs, that the Act specifically states it intends to assist.

33

Organ Transplant Authorization Act of 2008 does not suggest the government looked to provide contracting parties managing the OPTN "Federal financial assistance," but only to provide additional funding for non-profit OPOs.

The same is true for the legislative history surrounding the most recent amendment to the Act in 2023, the Securing the U.S. Organ Procurement and Transplantation Network Act. This legislation "modifi[ed] how the Health Resources and Services Administration" "funds and manages" the OPTN. Pub. L. 118–14. Specifically, it provides:

> This network is a public-private partnership that links the professionals involved in the U.S. donation and transplantation system. Historically, only one organization has received a contract for managing the network.
>
> The bill expressly authorizes HRSA to award multiple grants, contracts, or cooperative agreements to support the operation of the network and eliminates a cap on the amount of funding available for supporting the network. The bill also specifies that the network shall be operated through awards that are distinct from awards for supporting the operation of the network's board of directors.

Id. With those goals, the Securing the U.S. Organ Procurement and Transplantation Network Act was passed with the intent to correct the historic practice of awarding only one contract for managing the OPTN network. See id. The legislative history supports as much. Various senators expressed a need to pass the Securing the U.S. Organ Procurement and Transplantation Network Act to encourage competition in the organ transplant market, not to give any subsidies for those awarded the contracts. 169 Cong. Rec. S3721–02 at S3731. For example, Senator Wyden expressed:

> For the last 40 years, the same contractor has had a stronghold on this contract. The lack of competition has not been in the best interest of patients, and this fall the contract will be up for renewal.
>
> In last year's bipartisan investigation, the Finance Committee found shocking failures with the current contractor who oversees the entire system: long wait times for patients on transplant lists, viable organs being lost or damaged in transit. We saw pictures of these organs lying around in airport hangars. There has just been a

34

lack of accountability when the problems happen, technology failures, and even patient deaths.

The last place anybody wants to hear about gross mismanagement and incompetence is in the business of saving lives. It is time for real accountability and real change.

This bill would build on the administration's recently announced plans to modernize the program and clarify that there is the ability to award multiple contracts for these key functions. This would create real competition for these contracts and ensure the best-in-class organizations can be awarded contracts to support this critical system.

Id. Senator Grassley echoed a similar sentiment, stating:

For almost two decades, Congress, government watchdogs, and the media have questioned the United Network for Organ Sharing's ability to carry out its responsibilities. I have written about these issues since 2005. Since then, 200,000 Americans have died on the organ waiting list.

Those aren't numbers; those are lives. To put it in perspective, that is the population of Des Moines, IA. There is a reason I call the United Network for Organ Sharing the fox guarding the hen house.

In August of 2022, the Senate Finance Committee issued a bipartisan report that detailed vast disparities in how Organ Procurement Organizations serve their communities. Based on the findings, the organ network has worse outcomes for people of color and rural residents. This bipartisan investigation, which started when I was chairman of the Senate Finance Committee, uncovered fraud, waste, abuse, criminality, deadly patient safety issues, failure to recover organs, and retaliation against whistleblowers. The Senate Finance Committee's bipartisan report was clear: "From the top down, the U.S. transplant network is not working, putting Americans' lives at risk."

We must break up the monopoly that has held the U.S organ donation system hostage since 1986. Patients deserve the best possible care; it is the difference between life and death. Our bipartisan bill will help ensure they get the best care.

Id. Senator Sanders echoed a similar sentiment to his colleagues, stating: "[a]ll of us believe that the administration should have the flexibility it needs to fix the current system. We also believe that corporations should not be able to make an outrageous profit from the organ network." Id. Notably absent from the Senators' comments are any suggestions that this legislation was intended

to provide subsidies to those awarded government contracts to operate the OPTN. To the contrary, Congress expressed a need to promote *competition* in the organ transplant space. See id. (Senator Grassley discussing breaking up the "monopoly" on the organ transplant system; Senator Wyden expressing that more competition is better for the organ transplant market). As a whole, the legislative history surrounding the Act and its recent amendments shows that it was Congress's intent to provide government contractors like UNOS with compensation for the services it renders in managing and operating the OPTN, rather than a subsidy. See DeVargas, 911 F.2d at 1382.

Considering all of this, the Court concludes that UNOS's contract with the government for services does not constitute "Federal financial assistance" under Title VI. To start, the contract specifically provides that UNOS is to complete its work pursuant to § 274. (Doc. No. 92-1 at 1742 (stating that the purpose of the contract is to coordinate and improve the functions of the OPTN, as described under 42 U.S.C. § 274)). Consistent with this instruction, the stated purpose of UNOS's contract is "to support the operation of the [OPTN] in accordance with the Performance Work Statement," which provides for the OPTN's functions under §§ 274(a) and (b). (Doc. No. 92-1 at 1729, 1796). Further, it is undisputed that UNOS owns and manages UNet (Doc. No. 110 ¶ 15), the kidney donor transplant waitlist provided for under § 274(b). See 42 U.S.C. § 274(b)(2)(A) (the OPTN shall "establish one location with a list of individuals who need organs, and a system. . . to match organs and individuals included in the list"). Absent from the Act and its legislative history is any indication that this sort of contract was intended to constitute assistance to UNOS. This conclusion is supported by recent legislative action to spur competition and increase the number of contractors managing the OPTN. 169 Cong. Rec. S3721–02 at S3731.

The Court's conclusion remains firm notwithstanding Welch's argument that the contracts' payments are for UNOS to "purchase and maintain UNet." (Doc. No. 113 at 21–22). Welch relies

on Moreno v. Consolidated Rail Corp., 99 F.3d 782 (6th Cir. 1996), to no avail. In Moreno, the Consolidated Rail Corporation ("Conrail") argued that it did not receive "Federal financial assistance" under the Rehabilitation Act to improve railroad crossings because: the government distributed the money to the State of Michigan, and Conrail was an indirect beneficiary; the purpose of the federal statute under which Michigan received funds was not to subsidize railroads; and that "Conrail receive[d] no benefit for which it [did] not reimburse the state[.]" Id. at 787. The Sixth Circuit was not convinced by Conrail's arguments. The Moreno court reasoned that: the Rehabilitation Act defines a recipient broadly to "extend[] directly or through another recipient;" Conrail signed a "Master Agreement with an appendix containing an express promise to comply with the nondiscrimination regulations for federally assisted programs;" "the statute [that Conrail received funds pursuant to] is replete with language evincing Congress' awareness that the railroads would not have to pay more than 10 percent of the cost of the improvements;" and Conrail "own[ed] the improvements" it made to its own railroads. Id. at 787–88 ("the railroad companies receive federal funds to reconstruct or rehabilitate crossings that they are under a duty to maintain. . . the funds go directly to the railroad to pay for improvements that they would otherwise have to pay for themselves") (internal citation omitted).

This case is different. True, like in Moreno, UNOS owns UNet, and uses it to operate the OPTN. (Doc. No. 110 ¶ 15). However, unlike Moreno, UNOS only manages UNet pursuant to its contract under 42 U.S.C. § 274. (See Doc. No. 92-1 at Ex. S). Contrary to Moreno, in this case there is no statutory text or legislative history indicating Congress intended to give UNOS a subsidy. Rather, as just discussed, the Act provides narrow language indicating that only OPOs are subject to "financial assistance." Pub. L. 98–507. That is supported by the legislative history, that Congress was concerned with ensuring those entities received funding in the form of grants.

See S. Rep. 98–382. Those concerns did not extend to contracting entities managing the OPTN or UNet, as congressional representatives worried about ensuring market competition for those contracts so those entities would not benefit *too* much. See 169 Cong. Rec. S3721–02 at S3731. For all of these reasons, Welch's reliance on Moreno falls flat.

Welch further contends that UNOS receives federal funding because (1) it categorizes its government contract as a "grant" in its tax returns, and (2) it received a Paycheck Protection Program ("PPP") loan in 2020, which was forgiven. (Doc. No. 113 at 22). Even viewing these facts in Welch's favor, neither argument is convincing. As to the former, what UNOS categorizes its contract as in its own tax returns is of no moment—what controls here is the "intent of Congress" in relation to the funding. See Shotz, 420 F.3d at 1338. UNOS cannot change Congress's intent to only provide OPOs financial assistance by merely using the word "grant" in its tax filings. As to the latter argument, Title VI inexplicably states that no person shall be discriminated against under "any program or activity *receiving* Federal financial assistance." 42 U.S.C. § 2000d. The use of the word "receiving"—the present participle of "receive"—makes it unequivocally clear that the program or activity at issue must be receiving, or "com[ing] into possession of," such assistance. See Receive, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/receive (last visited February 14, 2025). For Welch's argument on the PPP loan to have merit, the Court would have to read "receiving" as "received." It declines to do so here. Because the text of Title VI clearly disposes of this argument, the Court need not consider it further. Brilliance Audio, 474 F.3d at 371 ("If the language of the statute is clear, then the inquiry is complete, and the court should look no further.").

Finally, Welch asserts that Congress clearly intended to fund UNOS to promote public safety, as is evidenced by the applicable contract being for "cost sharing" between UNOS and

38

HHS. (See Doc. No. 113 at 23 (citing Doc. No. 92-1 at Ex. S)). In support of this position, Welch relies on Rick's Mushroom Service, Inc. v. U.S., 521 F.3d 1338, 1341 (Fed. Cir. 2008). There, the federal government required entities managing waste transfer facilities to impose conservation features through "Cost Share Programs." Welch's reliance on Rick's Mushroom is misplaced for various reasons, the most pertinent of them being that Rick's Mushroom addresses the issue of whether the government consented to suit under the Tucket Act. Id. at 1343. Indeed, nothing in Rick's Mushroom discusses whether a particular contract constitutes "Federal financial assistance" for the purpose of a civil rights claim. See generally id. Accordingly, Welch's reliance on Rick's Mushroom here in support of its contention that cost sharing contracts are "Federal financial assistance" under Title VI is unpersuasive.

Ultimately, viewing all of the evidence in Welch's favor, there is no evidence in the record demonstrating that HHS intended to give UNOS "Federal financial assistance" when it contracted with UNOS for services under § 274. Because Title VI does not forbid discrimination by a government contractor, such as UNOS, but only discrimination by entities receiving assistance, UNOS is entitled to judgment as a matter of law on Welch's Title VI claim. Accordingly, Defendants' motion will be granted on Welch's Title VI claim against UNOS. Welch's motion on this claim will be denied.

### b. Intentional Discrimination

As the parties do not dispute that VUMC is provided "Federal financial assistance" for the purpose of Title VI, the Court moves to the next prong of Welch's claim, whether VUMC intentionally discriminated against him. Welch can prove his case of intentional discrimination by

showing direct evidence of racial discrimination or establishing a prima facie case.[21] <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992). Direct evidence of discrimination that requires a conclusion without an inference that the plaintiff was treated adversely because of his race. <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 805 (6th Cir. 1998); <u>see</u> <u>Mansfield v. City of Murfreesboro</u>, 706 F. App'x 231, 235 (6th Cir. 2017) ("[D]irect evidence is that evidence which, if believed, *requires* the conclusion that unlawful [discrimination] was at least a motivating factor" in the decisionmaker's actions.) (internal citation and quotations omitted); <u>see also</u> <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 805 (6th Cir. 1998) ("Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are [African-American].'"). So long as direct evidence of intentional discrimination is present, Welch need not provide circumstantial evidence to establish a prima facie case. <u>Kline v. Tennessee Valley Auth.</u>, 128 F.3d 337, 348–49 (6th Cir. 1997) ("The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both.").

As discussed above, <u>see</u> <u>supra</u>, Section II.B.2.c, "[d]iscriminatory purpose" implies "more than intent as volition or intent as awareness of consequences." <u>Personnel Adm'r of Massachusetts</u>, 442 U.S. at 279. Rather, it implies that the decisionmaker, in this case, VUMC, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." <u>Id.</u> In establishing intentional

---

[21] The Sixth Circuit has not established whether the <u>McDonnell Douglas</u> burden-shifting framework applies to Title VI claims. <u>See</u> <u>Johnson v. City of Clarksville</u>, 186 F. App'x 592, 595 (6th Cir. 2006) ("We assume without deciding that [the <u>McDonnell Douglas</u>] burden-shifting framework governs Plaintiffs' Title VI claims."); <u>see also</u> <u>Paasewe v. Ohio Arts Council</u>, 74 F. App'x 505, 508 (6th Cir. 2003) (applying <u>McDonnell Douglas</u> framework to a Title VI claim). This Court need not attempt to resolve this issue here. Rather, regardless of the analytical framework employed, the Court finds Welch has raised a genuine dispute of material fact on whether VUMC intentionally discriminated against him through direct evidence such that the employment of the <u>McDonnell Douglas</u> framework, even if applicable, is not required here.

40

discrimination, Welch may point to evidence that VUMC participated in, was aware of, or was deliberately indifferent to any discriminatory acts. <u>Foster v. Michigan</u>, 573 F. App'x 377, 389 (6th Cir. 2014); <u>see</u> <u>Blunt v. Lower Merion Sch. Dist.</u>, 767 F.3d 247, 273 (3d Cir. 2014) ("deliberate indifference may, in certain circumstances, establish intentional discrimination for the purposes of a Title VI claim"). The Court will first address Defendants' motion on this claim, then Welch's.[22]

i.    <u>VUMC's Motion</u>

VUMC contends that Welch cannot establish the requisite element of intentionality. (Doc. No. 91 at 19). In support, VUMC asserts: (1) the use of the race-based coefficient alone is not evidence of intentional discrimination; (2) historically, it was the national standard of care to use eGFR equations that included a race-based coefficient; and (3) VUMC used the same process of diagnosis and waitlist registration for all kidney transplant candidates, regardless of race. (Doc. No. 91 at 22–24). Welch counters that he does provide evidence of intentional discrimination in the form of VUMC's use of the race-based coefficient, asserting that VUMC's use of race-neutral factors "in conjunction with a race-based classification does not negate discrimination." (Doc. No. 113 at 16–17).

To put it kindly, VUMC's arguments miss the mark. The Court finds ample evidence in the record that shows there is, at minimum, a genuine dispute of material fact on whether VUMC intentionally discriminated against Welch. First, it is undisputed that: (1) the race-based coefficient multiples a Black patient's eGFR score by roughly 1.21 based solely on that patient's race (Doc. No. 95-38 at 27; Doc. No. Doc. No. 95-31 ¶¶ 41–42); and (2) the eGFR value, which

---

[22] Because the Court will grant Defendants' motion on Welch's Title VI claim against UNOS, <u>see</u> <u>supra</u>, Section III.B.1.a, the Court will only address Defendants' arguments on the intentional discrimination element that relate to VUMC.

is artificially inflated for Black patients by using the race-based coefficient, is one metric that impacts whether, and when, one qualifies to be put on the waitlist. (Doc. No. 110 ¶¶ 17–18, 29). The Court agrees with Welch that there is abundant evidence in the record showing that VUMC has repeatedly admitted to using this race-based coefficient in practice, including as applied to Welch. (Doc. No. 113-18 at 27:25–28:4; Doc. No. 113-23 at 22:9–11). There is further evidence that in July 2020, VUMC stopped using the race-based coefficient due to its lack of medical credibility. (Doc. No. 110 ¶ 61; Doc. No. 113-24 at 30:19–22; Doc. No. 95-10 at 14:6–24, 17:9–20, 83:24–84:14). In fact, there is evidence that Deputy CEO and Chief of Health System Officer for VUMC informed VUMC colleagues on July 6, 2020 that the race-based coefficient would no longer be used at VUMC due to its "source[] of racism." (Doc. No. 95-59 at 4). Specifically, the Deputy CEO and Chief of Health System Officer for VUMC stated:

> As you are aware, we as an organization are taking action to identify and remove *sources of racism in our environment*.
>
> In early 2019, beginning well before the recent elevation in the discussions around addressing sources of racism in our environment, a group of students and residents questioned the data behind a race-based calculation of estimation of [GFR AA] which currently appears on all of our lab reports.
>
> After a thorough evaluation of the underlying scientific evidence, the students and residents confirmed that there was *no race-based difference known to associate with kidney function*. The effect of artificially altering the calculation of estimates GFR for African American and Black patients, merely based on identified race, was to inflate the eGFR to fit the observed cohort-based data, now from more than 30 years ago.
>
> The aggregate effect, and that on individual patients, was considered. Ultimately, although *the kidney function of some individuals may appear to decline as a direct result of this change*, we fundamentally believe that all patients deserve a level playing field with regard to laboratory testing.
>
> Supported by Dr. Kim Rathmell and Dr. Alp Ikizler, the race based [eGFR AA] will no longer be reported as of July 8, 2020.

(Id.) (emphasis added).

This evidence, taken as a whole and in Welch's favor, demonstrates that VUMC used the race-based coefficient in Welch's lab reporting to artificially inflate his kidney function, and the use of that coefficient stemmed from "racism in [VUMC's] environment." (Id.). Considering this, VUMC's arguments that all reports reflected two eGFR values, and that the process for diagnosis and waitlist registration are the same for all patients, are of no moment. VUMC focuses its attention on the wrong issues: that two eGFR values are presented for all patients' lab results; the factors considered for waitlist eligibility; and the steps taken for each patient in waitlist registration. In doing so, VUMC ignores the heart of Welch's claim: *what* the two eGFR values represent and *how* they impact waitlist eligibility for Black kidney transplant candidates like Welch. When properly evaluating the evidence in light of the true nature of Welch's claim, the Court finds sufficient proof to raise a genuine dispute of material fact on whether VUMC participated in, and was aware of, discriminatory acts against Welch when it applied the race-based coefficient to his lab results. See Foster, 573 F. App'x at 389.

Should the use of the race-based coefficient—which VUMC's Deputy CEO and Chief Health System Officer admitted stemmed from racism—not be enough to preclude summary judgment here, there is further evidence creating a genuine dispute of material fact for the jury to resolve. While Welch fails to argue as much, there is plentiful evidence in the record that VUMC was deliberately indifferent to the impact of the use of the race-based coefficient on Welch. Foster, 573 F. App'x at 389; see Kollaritsch, 944 F.3d at 621 (to establish deliberate indifference, plaintiff must prove "(1) knowledge, (2) an act, (3) injury, and (4) causation").[23] To start, there is sufficient evidence in the record demonstrating that VUMC had knowledge the race-based coefficient was

---

[23] The Court will address the second two elements of a deliberate indifference claim, injury and causation, in the following section. See infra, Section III.B.1.c. As the Court discusses, evidence of all four elements of a deliberate indifference claim are present here.

indeed racist by at least July 2020, because it had "actual knowledge" of an incident of actionable discrimination that should have prompted a response. See Kollaritsch, 944 F.3d at 621. Welch has provided evidence that VUMC Center Director for Transplantation, Seth Karp, was a member of both UNOS and OPTN boards from 2017 to 2019 (Doc. No. 110 ¶ 37), during which UNOS's Ross Walton circulated to the OPTN Minority Affairs Committee an article by Dr. Nwamaka Enanya entitled *Reconsidering the Consequences of Using Race to Estimate Kidney Function*. (Id. ¶ 40; Doc. No. 95-44). Further, there is evidence that, in 2019, VUMC medical students questioned the validity of the race-based coefficient, (Doc. No. 110 ¶ 58; Doc. No. 95-59), and that in July 2020, VUMC elected to stop reporting race-based eGFR values in its lab reports due to its racist underpinnings (Doc. No. 110 ¶ 61; Doc. No. 95-59). These pieces of evidence, taken together, raise a genuine dispute of material fact on VUMC's knowledge of the racist foundations of the race-based coefficient. See Kollaritsch, 944 F.3d at 621.

Welch also presents sufficient evidence demonstrating that VUMC acted in a way that was "clearly unreasonable in light of known circumstances" that the race-based coefficient had no medical validity, yet continued to pervade its medical system. See id. The record indicates that, despite discontinuing the use of the race-based coefficient in kidney diagnosis and treatment, VUMC created a flyer for Black kidney transplant candidates explaining the changes in their kidney function numbers that specifically omitted information explaining that those changes could relate to VUMC's prior use of the race-based coefficient. (Doc. No. 94-2). Indeed, an email from a VUMC employee to the Nephrology Diversity Work Group states:

> Please see below the messaging which Julie, Devika and I drafted. This would be made available to our patients following the removal of the race-based eGFR calculation. It would also be available for our nurses and other providers (PCPs) who could benefit from having a standard text like this for patients:

"You may have been following your percent kidney function, or estimated glomerular filtration rate (eGFR), over time. We have updated our formula for estimating kidney function and you may notice a slight change in your estimated kidney function. However, this change neither affects your actual kidney function, nor impacts your care negatively in any way. If you have any questions about this change, please do not hesitate to reach out to your providers."

You'll notice that this version of the message makes no mention of race. Our decision to keep it that way is informed by the recent article (attached) which Devika shared. We applied the main themes in that article to ensure that our wording is appropriate — see below for details.

"Provoking and exacerbating undue trauma": I believe that removing any mention of race in the situation will likely lead to less chances of mistrust in the healthcare system

"Frustrated by ambiguity": Simple enough message takes care of this

"Making sense of the prognostic enigma": Our explanation that this does not change actual kidney function provides prognostic information

"Mobilizing self-management": By making this information available for the engaged patients, we empower them with information that encourages them to participate in shared decision-making[.]

(Id. at 2). This is evidence demonstrating that VUMC did not disclose to patients the true reason for the changes in their eGFR values once it discontinued the use of the race-based coefficient. There is also evidence that Welch did not learn of his wait time adjustment due to the race-based coefficient's discontinued use until December 2023. (Doc. No. 110 ¶ 70; Doc. No. 112-1 ¶¶ 30–31). This was more than *three* years after VUMC says it stopped using the coefficient, and almost a year after UNOS mandated revisions to Black kidney transplant candidates' waitlist times to remedy prior use of the coefficient. (Doc. No. 95-59 at 4; Doc. No. 95-66 at 5). This evidence, taken together and in Welch's favor, demonstrates there is sufficient evidence from which the jury can conclude that VUMC did not act reasonably after announcing it would no longer use the race-based coefficient because it was racist in 2020.

45

Contrary to VUMC's assertion, "this is not merely a case of disparate impact." Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., OK, 334 F.3d 928, 932 (10th Cir. 2003). In such cases, "there is no intent to act or not act at all," and "usually deal[s] with facially neutral policies and procedures that, when applied, have an unintentional discriminatory *effect* on certain individuals based on their race, color, or national origin." Id. Rather, this is a case where there is evidence that: VUMC intentionally applied a coefficient to Welch's eGFR score that artificially inflated his kidney function solely based on his race; VUMC knew that race-based coefficient was not grounded in legitimate medical research, yet applied it anyway; even after VUMC stopped using the race-based coefficient, it failed to timely recalculate wait time adjustments for impacted Black kidney transplant candidates; and, upon telling Black patients why their kidney function levels changed, tried to conceal the reason for the change was directly tied to their race. As the Tenth Circuit has aptly stated, "[c]hoice implicates intent." Bryant, 334 F.3d at 933. It is inapposite that this Court could hold that, as a matter of law, none of these facts demonstrate intentional discrimination under Title VI. See id. Such a holding would allow medical centers "to sit idly, or intentionally, by while horrible acts of discrimination occurred on their grounds by and to" patients in their care. Id. The Court declines to take that approach. It goes without saying that there is, at minimum, a genuine dispute of material fact for the jury to consider on whether VUMC intentionally discriminated against Welch such that summary judgment is inappropriate on those grounds here.

ii.    Welch's Motion

In Welch's cross-motion for summary judgment, Welch asserts there is no genuine dispute of material fact that VUMC intentionally discriminated against him by using the race-based coefficient in calculating his eGFR score. (Doc. No. 94 at 18–22). VUMC responds by rearticulating the arguments it made in its motion for summary judgment on Welch's Title VI

46

claim, and emphasizing that Welch applied the wrong law in his motion. (Doc. No. 108 at 10–16). Here, applying the standard of review that favors VUMC, the Court agrees with VUMC that Welch is not entitled to summary judgment on his Title VI claim.

Viewing the evidence in VUMC's favor, VUMC's second argument is dispositive here. VUMC is correct that Welch applies the wrong standard—the one for equal protection claims under the Fourteenth Amendment, not Title VI claims—in his motion. (See Doc. No. 94 at 18–22 (citing equal protection cases and standard in support of his motion)). As VUMC properly points out, the Sixth Circuit has rejected this approach on Title VII claims, noting "[d]ifferences between the language of the statute and the Constitution supply an initial reason why one test does not apply to the other." L.W. by and through Williams v. Skrmetti, 83 F.4th 460, 484 (6th Cir. 2023). Justice Gorsuch has echoed a similar sentiment as to Title VI claims, noting that Title VI and the Equal Protection Clause are "differently worded provisions," and so analyzing them as if they "mean the same thing is implausible on its face." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (distinguishing the Equal Protection Clause from Title VI); see id. at 290 (concluding that Title VI and Title VII's terms are "essentially identical").

Because Welch has not presented any evidence demonstrating there is no genuine dispute of material fact on any of the elements of his Title VI claim—given he does not even cite to the correct elements of his claim—he has not carried his burden to establish he is entitled to summary judgment here. See Rodgers, 344 F.3d at 595. The Court therefore need not consider the parties' alternative arguments on whether Welch's motion succeeds on his Title VI claim. Welch's motion on his Title VI claim will be denied.

47

c. <u>Causation</u>

The Court turns to VUMC's next argument, that it is entitled to summary judgment on Welch's Title VI claim because he cannot establish causation. (Doc. No. 91 at 24). VUMC contends that to prove his claim, Welch must come forward with evidence that "he has not received a kidney transplant because he is Black," which he has failed to do. (<u>Id.</u>). In support of this argument, VUMC notes the complexity of the criteria VUMC healthcare professionals consider in deciding whether to register a patient for the waitlist; that registration does not hinge one single qualifying eGFR result; and Welch's data analytics expert, David Cutler, merely opines that "but for use of a race-conscious coefficient, Welch may have received some undefined number of additional offers for kidneys." (<u>Id.</u> at 24–26). Welch disagrees, contending that it is VUMC's burden to establish it would have made the same decision regardless of Welch's race, which it cannot do. (Doc. No. 113 at 17). Welch further argues that even if he has to show causation to survive summary judgment, he has satisfied that burden through Professor Culter's expert testimony. (<u>Id.</u> at 19). Here, the Court agrees with Welch that there is a genuine dispute of material fact on whether VUMC's intentional discrimination caused his injuries.

As an initial matter, while the parties agree that causation applies to Welch's Title VI claim, it is apparent from their briefing and the Court's own analysis of Sixth Circuit authority that this Circuit has not addressed whether that is the case. Looking to authority from other Circuits and district courts within the Sixth Circuit establishes that regardless of the approach a plaintiff uses to establish intentional discrimination (i.e., through direct or circumstantial evidence), a plaintiff must show causation to prevail on a Title VI claim. See <u>Peters v. Jenney</u>, 327 F.3d 307, 321 n. 15 (4th Cir. 2003) (stating that the <u>McDonnell Douglas</u> framework does not alter the elements of a Title VI claim, only the manner in which a plaintiff can prove causation); <u>Caulker v. Michigan State Univ.</u>, 2009 WL 3644778, at *5 (W.D. Mich. Nov. 2, 2009) (applying <u>Peters</u>). Further, while

48

relevant authority is scant, the Court agrees with the parties that "but-for" causation is the proper measure to apply to Welch's Title VI claim. See Students for Fair Admissions, Inc., 600 U.S. at 289 (Gorsuch, J., concurring) ("because of" in Title VI invokes "but-for causation"); Lapham v. Walgreen Co., 88 F.4th 879, 891 (11th Cir. 2023) (the word "because" suggests but-for causation); see also Kollaritsch v. Michigan State Univ. Bd. of Trustees, 944 F.3d 613, 622 (6th Cir. 2019) (for Title IX claim, causation means the act caused the injury, in that it would not have happened "but for" the act).[24]  Thus, Welch need not show that VUMC's actions were "the primary or proximate cause of [Welch's] injury to qualify," as "[a]ll that matters is that [Welch's] injury would not have happened *but for* [VUMC's] conduct." Students for Fair Admissions, Inc., 600 U.S. at 289 (citing Bostock v. Clayton Cnty., Georgia, 590 U.S. 656 (2020) ("because of" means "by reason of" or "on account of," which implicates but-for causation)).

The Court finds that Welch has presented sufficient evidence to establish a genuine dispute of material fact on whether he can establish that but-for VUMC's intentional discrimination, he would have not been "depriv[ed] and/or delay[ed]" in an "award of a donor kidney." (Doc. No. 1 ¶ 72).  Indeed, Professor Cutler provides expert testimony that due to VUMC's use of the race-based coefficient: out of 307 identified match runs, Welch may have received one or more "offers spread throughout the 2019–2022 time period" (Doc. No. 113-17 ¶¶ 43, 51; Doc. No. 117-4 at 126:9–11), and that for at least two of those offers, Welch was "certain" to have received an offer for a kidney that VUMC indicated a "Provisional Yes" on accepting the kidney for Welch. (Doc.

---

[24] Despite this, Welch asserts that it is VUMC's burden to show it would have made the same decision regardless of his race.  In support of this argument, Welch relies on Texas v. Lesage, 528 U.S. 18, 20 (1999), addressing a § 1983 Fourteenth Amendment claim.  Again, Welch's argument attempts to merge constitutional law with Title VI law in a way that is impermissible. See Students for Fair Admissions, Inc., 600 U.S. at 308 (2023).  Accordingly, the Court need not address this argument further.

49

No. 113-28). Further, Professor Cutler asserts that had Defendants not used the race-based coefficient, Welch would have likely been offered at least one kidney by July 22, 2019. (Doc. No. 113-17 ¶ 51). As Welch highlights, many of these possible offers would have occurred before Welch was declared inactive on the waitlist in October 2022. (Doc. No. 113-18 at 43:13–16). Further, some would have occurred *after* VUMC vowed to stop using the race-based coefficient in calculating eGFR values for Black kidney transplant candidates. (Doc. No. 113-17 ¶¶ 44, 51).

VUMC may very well be right that a jury will find Professor Cutler unreliable.[25] Or a jury may find that Welch would not have been offered a kidney, regardless of VUMC's use of the race-based coefficient. But these issues are best resolved by a jury that must weigh the evidence and its credibility, rather than this Court which must take all the evidence and view it in Welch's favor. See Anderson, 477 U.S. at 249 (courts do not weigh evidence at summary judgment). In doing so, the Court finds Welch has raised a genuine dispute of material fact on whether VUMC's intentional discrimination caused Welch's injuries. Accordingly, VUMC's motion on Welch's Title VI claim will be denied.

### 2. Breach of Fiduciary Duty

VUMC next contends it is entitled to summary judgment on Welch's second claim, which alleges that VUMC breached its fiduciary duty to him by "knowingly submitting eGFR scores for Mr. Welch that were tainted by use of the race-based coefficient," "fail[ing] for [a] year to recalculate Mr. Welch's wait time," and failing to disclose these things to Welch (Doc. No. 1 ¶ 77). See supra, Section II.B.2.d. VUMC contends it is entitled to summary judgment on Welch's breach of fiduciary duty claim because VUMC, as a matter of law, does not owe Welch a fiduciary

---

[25] To the extent that VUMC contends that this evidence is inadmissible, as it seems to suggest, such a determination is best left for trial.

duty. (Doc. No. 91 at 28–29). Instead, VUMC asserts that it is Welch's doctors, not the hospital he receives treatment at, that holds that duty. (Id.). Welch disagrees, arguing that VUMC is liable for the torts of its employee doctors under the doctrine of respondeat superior. (Doc. No. 113 at 24–25). Welch also moves for summary judgment on this claim as a matter of law. (Doc. No. 94 at 28). The Court will first address VUMC's motion, followed by Welch's.

"Under Tennessee law, a fiduciary relationship may arise between two parties in any number of circumstances, both formal and informal, including whenever confidence is reposed by one party in another who exercises dominion and influence." Pagliara v. Johnston Barton Proctor & Rose, LLP, 708 F.3d 813, 818 (6th Cir. 2013) (internal citation and quotations omitted). "In the most general sense, a fiduciary duty is the duty to act with due regard for the interests of another," id., requiring a fiduciary to "exercise good faith and due diligence" in its dealings." Id. (citing McRedmond v. Estate of Marianelli, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000)). Further, "[t]he precise contours of a duty are necessarily a matter of context." Id. It is axiomatic that party claiming breach of fiduciary duty must show "(1) the existence of a fiduciary duty (2) that was breached (3) proximately causing damages." Id. (citing 23 Tennessee Practice Series: Elements of an Action § 8.1 (2009–2010)).

As an initial matter, whether a hospital owes its patients a fiduciary duty is a matter of first impression both in Tennessee courts and in the Sixth Circuit. As VUMC correctly emphasizes, to the extent this question has been answered in other federal and state courts, they have found no such duty exists absent vicarious liability. See, e.g., Valley Health Sys., LLC v. Murray, 544 P.3d 904, 909 (Nev. 2024) (hospitals do not owe patients a fiduciary duty); Gonzales v. Palo Verde Mental Health Servs., 783 P.2d 833, 835 (Ariz. Ct. App. 1989) (same); see also Sherwood v. Danbury Hosp., 278 Con. 163 (2006) (patient "provided scant reason to conclude that a hospital

51

owes a patient the duty of a fiduciary"); <u>Moore v. Regents of the Univ. of Cal.</u>, 51 Cal.3d 120 (1990) (noting that if hospital was liable for breach of fiduciary duty, it could only be through vicarious liability); <u>c.f.</u> <u>Burton v. William Beaumont Hosp.</u>, 373 F. Supp. 2d 707, 724 (E.D. Mich. 2005) (declining to extend the "logic of the fiduciary relationship that exists between a doctor and a patient to encompass a hospital's billing practices for medical services rendered").[26] Welch seems to concede as much, as he argues only that VUMC is liable through a theory of respondeat superior. (Doc. No. 113 at 25.) Given this, the Court is not inclined to find as a matter of law that VUMC has a fiduciary duty to its patients absent vicarious liability.

As to Welch's theory that VUMC is liable through respondeat superior, the Court is not aware of Tennessee courts, or courts in the Sixth Circuit, evaluating the validity of this position. However, as previously discussed, sufficient authority exists to recognize the doctrine in this context. <u>See</u> <u>supra</u>, Section II.B.2.d; <u>c.f.</u> <u>Johnson v. LeBonheur Children's Medical Cntr.</u>, 74 S.W.3d 338, 343 (Tenn. 2002) (when evaluating Tennessee medical malpractice statute, noting "[n]othing in the statute [] immunizes a private hospital from liability for the acts or omissions of physician residents . . . who are [] acting as agents or servants of the private hospital"). Still, assuming respondeat superior liability does attach to VUMC here such that it had a fiduciary duty to Welch, the Court must determine if there is a genuine dispute of fact on the elements of respondeat superior liability. In order to hold a principal, like VUMC, liable for the acts of another, like its doctors, under the theory of respondeat superior, Welch must prove: "(1) that the person

---

[26] The Court is aware of <u>Anderson v. Kindred Hosp.</u>, which notes in the context of interpreting the Emergency Medical Treatment and Active Labor Act that "[a]fter a patient has been admitted in good faith as an inpatient, professional (i.e., doctor-patient) and fiduciary (i.e., hospital-patient) duties attach to the situation," duties that "[s]tate law is perfectly adept at" enforcing. 2008 WL 794275, at *4 (E.D. Tenn. 2008). However, the <u>Anderson</u> court provides no authority for the proposition that fiduciary duties apply to the "hospital-patient" relationship. <u>See</u> <u>id.</u> Given the ample authority to the contrary, the Court is not persuaded to adopt the position in <u>Anderson</u> here.

causing the injury was the principal's agent and (2) that the person causing the injury was acting on the principal's business and acting within the scope of his or her employment when the injury occurred." Tucker v. Sierra Builders, 180 S.W.3d 109, 120 (Tenn. 2005) (citing Russell v. City of Memphis, 106 S.W.3d 655, 657 (Tenn. Ct. App. 2002)); Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co., 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992)).

While the Court found Welch plausibly alleged these elements in his Complaint, see supra, Section II.B.2.d, he fails to offer admissible evidence to support them at the summary judgment stage.[27]  Absent from Welch's briefing and supporting materials are any reference to the "person causing the injury" that Welch asserts here.  See Tucker, 180 S.W.3d at 120.  True, as Welch contends, "doctors have a fiduciary duty to their patients" (Doc. No. 113 at 24).  See Shadrick, 963 S.W.2d at 736.  But Welch does not cite to any evidence demonstrating what doctor breached the duties he alleges here, i.e. registering him to UNOS using a race-based coefficient, failing to recalculate Welch's waitlist time for a year, and failing to disclose the same.  (See id. at 24–26 (not citing any evidence supporting his breach of fiduciary duty claim)).  The same is true as to those doctors' employments—Welch points to no evidence that those doctors, whoever they may be, are employed by VUMC.  (See id.).  And Welch provides no argument, or citations to evidence, establishing that those unnamed doctors acted within the scope of their employments when committing the alleged breaches here.

It is not lost on this Court that Welch is likely aware of at least some of the evidence to support his respondeat superior theory of liability, such as the doctors' identities, and their employment(s) with VUMC.  Indeed, the Complaint alleges that Welch's surgeon informed him

---

[27] Because Welch fails to raise a genuine dispute of material fact on these elements, the Court need not address the parties' arguments on the proper scope of VUMC's purported fiduciary duty. (Doc. No. 91 at 29–30; Doc. No. 113 at 25).

of his wait time adjustment, suggesting that doctor may have been one of the individuals whose actions VUMC could have been held vicariously liable for.  (<u>See</u> Doc. No. 1 ¶ 14).  Further, in other portions of his briefing, Welch provides at least some information supporting his breach of fiduciary duty claim, including: a declaration establishing the identity of his surgeon, Dr. Rachel Forbes; that Welch was indeed a patient at VUMC; and that Dr. Lewis used the race-based coefficient, despite not reading the purported research it relied on.  (Doc. No. 113-2 ¶¶ 2–4; Doc. No. 113-23 at 55:23–56:6; <u>see</u> Doc. No. 94 at 28–29).  And, while Welch asserts Dr. Lewis used the race-based coefficient in treating him (Doc. No. 113 at 27), none of the evidence he cites to in support of that statement shows as much.  (<u>See</u> Doc. No. 110 ¶¶ 27–28, 31–33 (mentioning Dr. Lewis's reliance on the race-based coefficient, but not that she treated Welch with the coefficient, or that she provided Welch's eGFR AA data to UNOS)).

Considering this evidence together and in Welch's favor, it is no more than a "scintilla of evidence" in support of Welch's breach of fiduciary duty claim.  <u>See</u> <u>Anderson</u>, 477 U.S. at 252.  The record remains devoid of any evidence on who registered Welch for UNOS with the race-based coefficient, who calculated Welch's adjusted waitlist time, who reported that time to UNOS, whether Dr. Forbes works for VUMC, and the scope of Dr. Forbes's and Dr. Lewis's employment duties. [28]  If the record does contain such information, Welch has failed to bring that evidence to the Court's attention.  <u>See</u> <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), cert denied, 494 U.S. 1091 (1990) (in determining whether there is a genuine issue of material fact, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim").

---

[28] Indeed, the record indicates Welch was not registered for the waitlist with the use of an eGFR AA value, but rather was registered upon continued use of dialysis.  (Doc. No. 112-1 ¶¶ 27, 29).

54

At this stage of the proceedings, Welch may not "rest upon its mere allegations" in his Complaint to survive summary judgment. Moldowan v. City of Warren, 578 F.3d 351, 374 (6th Cir. 2009). Viewing the facts in the light most favorable to Welch, the Court finds Welch has failed to create a genuine dispute of material fact on whether VUMC is vicariously liable for its doctors' actions here. See Matsushita, 475 U.S. at 587. Accordingly, VUMC's motion will be granted on Welch's breach of fiduciary duty claim. Given this, the Court need not consider Welch's motion on this claim, as it will be denied.

### 3. THRA[29]

Welch's third claim asserts that Defendants violated the THRA by intentionally discriminating against him by allowing and applying the race-based coefficient to artificially inflate Black kidney transplant candidates' eGFR scores, thus delaying Welch's accrual of wait time and prejudicing his chances of receiving a donor kidney. (Doc. No. 1 ¶¶ 80–87). To prevail on his intentional discrimination THRA claim, as with his Title VI claim, Welch must establish a prima facie case of intentional discrimination and causation. Tenn. Code Ann. § 4–21–311(e). The Tennessee legislature intended for the THRA to "be coextensive with federal law." Parker v. Warren Cnty. Util. Dist., 2 S.W.3d 170, 172 (Tenn. 1999) (quoting Carr v. United Parcel Serv., 955 S.W.2d 832, 834–35 (Tenn. 1997)). "Accordingly, an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act." Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006). The Court will therefore consider the same standard as set forth above on Welch's Title VI claim for his THRA claim here. See supra, Section III.B.1.b; see also Goree v.

---

[29] VUMC and Welch briefed whether Welch sufficiently alleged a THRA public accommodation discrimination claim under Tenn. Code Ann. § 4–21–501 at the motion to dismiss stage (see supra, Section II.B.2.e). Here, however, the parties appear to agree that Welch's THRA claim is one for intentional discrimination under Tenn. Code Ann. § 4–21–311(e). Given this, the Court will address Welch's THRA claim at this stage as one for intentional discrimination. The Court cautions to parties to ensure they agree on the nature of this claim as this case proceeds to trial.

United Parcel Service, Inc., 490 S.W.3d 413, 426 (Tenn. 2015) (applying the same analysis under a Title VI claim to the plaintiff's THRA claim); Spann v. Abraham, 36 S.W.3d 452, 465 (Tenn. Ct. App. 1999) (applying the McDonnell Douglas burden-shifting framework to a pregnancy discrimination claim brought under the THRA).[30] Again, the Court will address the cross-motions by party.

### a. VUMC

As to VUMC, as already discussed, see supra, Section III.B.1.b.ii, there is sufficient evidence in the record to create a genuine dispute of material fact on whether VUMC intentionally discriminated against Welch, and whether such discrimination caused Welch injury. For the reasons already articulated, see supra, Section III.B.1.b.ii, VUMC's motion will be denied on Welch's THRA claim.

### b. UNOS

As to UNOS's motion, it fails for the same reason. While UNOS argues that it has never had a role in evaluating patients' medical conditions, and never required or encouraged transplant hospitals or their providers to use the race-based eGFR coefficient, (Doc. No. 91 at 19–21), there is sufficient evidence in the record demonstrating that UNOS was at least aware of transplant

---

[30] Despite the THRA and Title VI being largely harmonized, the claims are not identical. A plaintiff can show intentional discrimination through "asserting a claim of disparate treatment" under the THRA. See Goree, 490 S.W.3d at 426 ("A plaintiff asserting a claim of disparate treatment, or intentional discrimination based on race, can proceed to trial either by offering direct evidence that the employer's action was motivated by race, or by presenting circumstantial evidence sufficient to raise an inference of discrimination.") (internal citation omitted). This is contrary to Title VI. See Doe v. BlueCross BlueShield of Tennessee, Inc., 926 F.3d 235, 240 (6th Cir. 2019) ("Title VI, for example, doesn't prohibit disparate-impact discrimination") (citing Alexander, 532 U.S. at 280). The Court need not consider this discrepancy in how the Title VI and THRA discrimination claims are viewed for the purposes of resolving the instant motions, given there is sufficient evidence in the record to conclude there is a genuine dispute of material fact on whether Defendants intentionally discriminated against Welch under the more demanding Title VI standard.

hospitals using the race-based coefficient.  Foster, 573 F. App'x at 389.  As Welch argues, there is evidence in the record that: UNOS knowingly uses in UNet, among other measures, eGFR data that includes the race-based coefficient and used it in its UNet algorithm (Doc. No. 110 ¶¶ 15, 30, 46, 48); knew VUMC used the race-based coefficient in generating eGFR scores (id.); had a staff member question the use of the race-based coefficient (Doc. No. 110 ¶ 40); and nonetheless continued using that data in its UNet database when it generated match runs (Doc. No. 113-17 ¶¶ 42–51).  This evidence alone, viewed in Welch's favor, creates a genuine dispute of material fact on whether UNOS intentionally discriminated against Welch.

Further, Welch provides additional evidence that creates a genuine dispute of material fact on whether UNOS was deliberately indifferent to transplant hospitals' use of the race-based coefficient in providing patient registration information.  See supra, Section III.B.2.b; Kollaritsch, 944 F.3d at 621.  The record contains evidence that despite UNOS knowing transplant hospitals used the race-based coefficient, and its own staff having concerns about the validity of the coefficient, UNOS did not announce that OPTN policy would prohibit the practice until July 2022. (Doc. No. 110 ¶ 64; Doc. No. 112-1 ¶ 16).  Further, UNOS did not announce that OPTN would require wait time adjustments for Black kidney transplant candidates until January 2023.  (Doc. No. 110 ¶ 65; Doc. No. 95-66 at 2–3).  In doing so, UNOS gave transplant hospitals a year to complete that mandate.  (Doc. No. 95-66 at 5).  Viewing this evidence in Welch's favor, a reasonable juror could find it unreasonable that UNOS, as the entity in charge of operating the OPTN and the owner of UNet, did not immediately seek to correct the use of the race-based coefficient once it had knowledge that its use impacted the wait times for Black patients.  See Kollaritsch, 944 F.3d at 621.  And, as described above, see supra, Section III.B.2.b, there is a

57

genuine dispute of material fact on whether this deliberate inaction caused Welch's injuries. Accordingly, UNOS's motion will be denied on this claim.

### c. Welch

Just as Welch's motion on his Title VI claim fails because he does not apply the correct law, see supra, Section III.B.2.b.ii, the same is true for his THRA claim. (See Doc. No. 94 at 24 (applying strict scrutiny analysis to THRA claim)). Because Welch, again, fails to apply the correct law to his THRA claim, he does not meet his burden of establishing he is entitled to judgment as a matter of law on his THRA claim against Defendants. See Rodgers, 344 F.3d at 595. Welch's motion on his THRA claim will be denied.

### 4. Healthcare Liability

VUMC further argues that all of Welch's claims sound in health care liability, and thus are barred by the Tennessee Health Care Liability Act ("THCLA") for noncompliance with its provisions. (Doc. No. 91 at 31). Welch disagrees, contending that he has never "suggested this discrimination claim actually sounds in medical malpractice." (Doc. No. 113 at 26–27). Welch's response leaves something to be desired, as he does not grapple with the authority VUMC relies on in its argument. Regardless, the Court finds VUMC's argument, and the authority it relies on in support, to be unpersuasive.

Under the THCLA, "most claims [] arising within a medical setting constitute health care liability actions" and are "subject to the strictures outlined in the THCLA," including pre-suit notification, and good faith and expert proof requirements. Osunde v. Delta Medical Cntr., 505 S.W.2d 875, 884–85 (Tenn. Ct. App. 2016); Tenn. Code Ann. §§ 29–26–121, 29–26–122, 29–26–115. A "health care liability action," or in other words, a medical malpractice claim, subject to the "strictures" outlined in the THCLA includes actions that "alleg[e] that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care

58

services to a person, regardless of the theory of liability on which the action is based[.]"  Id.; Tenn. Code Ann. § 29–26–101(a)(1).  Under the THCLA, healthcare providers include "nongovernmental health care facil[ities]" such as VUMC.  Tenn. Code Ann. § 29–26–101(a)(2)(B).  Tennessee state courts have interpreted the language of Tenn. Code Ann. § 29–26–101 broadly, to include "*all* civil actions alleging that a covered health care provider. . . ha[s] caused an injury related to the provision of. . . health care services."  Ellithorpe v. Weismark, 479 S.W.3d 818, 827 (Tenn. 2015).  Whether a claim constitutes a health care liability claim for the purposes of the THCLA depends on the "gravamen" or the "substantial point or essence" of the Complaint.  Estate of French v. Stratford House, 333 S.W.3d 546, 557 (Tenn. 2011), rev'd on other grounds in Cooper v. Mandy, 639 S.W.3d 29, 33 (Tenn. 2022).

Because Welch does not contest that he did not satisfy the strictures outlined in the THCLA, his claims against VUMC cannot proceed if "the [C]omplaint alleges that [Welch] suffered an injury related to the provision of health care services."  Lacy v. Mitchell, 541 S.W.3d 55, 60 (Tenn. Ct. App. 2016).  Whether a case of this nature—in which a plaintiff plausibly alleges intentional discrimination in the medical field under Title VI—can be subject to state law health care liability requirements is yet another question unanswered by any court in the Sixth Circuit (or any other Circuit, for that matter).  Accordingly, the Court will rely on instructive, albeit far from analogous, case law addressing the overlap between health care liability claims and civil rights claims in similar contexts, such as the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, to inform its analysis here.

At first glance, one might assume that VUMC is correct that the THCLA applies to Welch's claims.  True, the Complaint alleges that Welch was treated for his kidney disease at VUMC (Doc. No. 1 ¶¶ 5, 9, 14), that VUMC used the race-based coefficient in his treatment (id. ¶ 14), and that

59

use of that coefficient deprived or delayed Welch's award of a donor kidney (id. ¶ 72). Indeed, viewing the scope of the THCLA broadly, these allegations could lead to the conclusion that Welch's claims against VUMC sound in health care liability, if one interprets VUMC calculating Welch's eGFR using the race-based coefficient as being "related to the provision" or "failure to provide" Welch "health care services." Ellithorpe, 479 S.W.3d at 827; see Cooper, 639 S.W.3d at 34 (the scope of the THLCA is broad).

However, upon surveying other cases in which plaintiffs brought civil rights claims that courts found truly sounded in state medical malpractice law, VUMC's argument falls apart. Those cases, unlike the instant one, all have one thing in common: none of them sufficiently alleged or provided evidence supporting discrimination based on the plaintiffs' protected characteristics. Rather, the plaintiffs' purported civil rights claims all were rooted in alleged mistreatment as pertaining to their medical conditions. See, e.g., Fitzgerald v. Corrections Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005) (affirming summary judgment where plaintiff's "principal basis" for his claim against a doctor was because of the doctor's recommendation to "do nothing" and plaintiff would not have been "otherwise qualified" for treatment in the absence of his disability); Powell v. Columbus Medical Enterprises, LLC, 2021 WL 8053886, at *2 (6th Cir. Dec. 13, 2021) (affirming dismissal of ADA claim where plaintiff based claim on doctor's refusal to change his medications); Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) (concluding that ADA "cannot be based on medical treatment decisions" where plaintiff alleged inadequate medical care for his diabetes); Sharp v. Good Samartian Hosp., Corvallis Oregon, 2021 WL 7084879, at *2 (D. Or. July 8, 2021) (finding plaintiff's claim that provider failed to perform proper tests that would have corrected plaintiff's diagnosis was not colorable under the ADA where plaintiff did not make any allegations that he was discriminated against based on his disability); Hollinger v. Reading

60

Health Sys., 2017 WL 429804, at *8 n.9 (E.D. Pa. Jan. 31, 2017) (dismissing ADA claim on grounds that plaintiff failed to allege discrimination, noting "[a]ny allegations that the hospital failed to properly treat plaintiff, or discharged him too early, sound in medical negligence—not discrimination").

Unlike those cases, here, Welch unequivocally alleges, and supports with evidence, intentional discrimination based on his race. See supra, Sections II.B.2.c and III.B.1, 3. In doing so, Welch demonstrates that his claims are not based on VUMC's failure to properly treat his kidney disease. Rather, Welch alleges, and provides evidence supporting, that the UNet software considers eGFR scores, some of which include the race-based coefficient, as a factor in calculating wait time adjustments for those on the national kidney transplant waitlist. (Doc. No. 1 ¶ 37). Welch further alleges, and brings forth evidence showing, that VUMC generates Black patients' eGFR scores using a race-based coefficient, which impacts whether and when a patient is registered to UNet. (Id. ¶¶ 71, 84, 85). At bottom, Welch's remaining claims are rooted in the premise that Defendants had a practice of "knowingly input[ing] and us[ing] modified wait times for Black patients in" UNet, and "fail[ing] to take prompt action to ensure Mr. Welch's and other Black patients' wait times were recalculated," "causing Black patients, including Mr. Welch, to be ranked lower for specific donor kidneys than non-Black patients." (Id.). Welch alleges that this practice applied to all Black kidney transplant candidates such as Welch, irrespective of VUMC's treatment decisions for that patient, or their health status. (See generally Doc. No. 1).

Notably absent from the Complaint is any reference to VUMC's care falling below the applicable standard of care, as one must allege to succeed on a medical malpractice claim (see id.).

<u>See</u> Tenn. Code Ann. § 29–26–115(a).[31]  Instead, Welch argues that Defendants intentionally

discriminated against him because of his race, thereby *depriving* him of medical care.  (Doc. No.

1 ¶ 72 (asserting Defendants' discrimination deprived Welch of a kidney); ¶ 86 (same)).  Thus, the

"substantial point" of Welch's discrimination claims are that Defendants discriminate against

Black patients, like Welch, to prevent them from obtaining full treatment opportunities—not that

VUMC failed to provide proper care for Welch during his kidney disease treatment.  <u>See</u> <u>Estate of</u>

<u>French</u>, 333 S.W.3d at 557.

Limited authority on whether a medical provider may be sued under civil rights laws

supports this conclusion.  While not directly on point, as there were no state medical malpractice

laws at issue, cases from the Eleventh Circuit and Second Circuit demonstrate that civil rights

claims against health care providers may proceed when the plaintiff sufficiently alleges intentional

discrimination.  <u>See</u> <u>Liese v. Indian River Cnty. Hosp. Dist.</u>, 701 F.3d 334, 342–45, 351 (11th Cir.

---

[31] The THLCA requires plaintiffs to satisfy the following elements to establish a health care
liability action:

> (1) The recognized standard of acceptable professional practice in the profession
> and the specialty thereof, if any, that the defendant practices in the community in
> which the defendant practices or in a similar community at the time the alleged
> injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and
> reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff
> suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29–26–115(a).  As VUMC notes (Doc. No. 91 at 33–34), these elements are
inapplicable to the allegations in the Complaint.  The reasons for this lie in VUMC's evidence that
it acted within the applicable standard of care in using the race-based coefficient to measure eGFR
values for Black kidney transplant candidates.  (Doc. No. 89-6 at 67:17–68:21).  While the Court
does not consider this evidence in evaluating the gravamen of the Complaint, it notes that Welch
could not likely sufficiently allege a medical malpractice claim, even if he wanted to, because
VUMC likely acted within the applicable standard of care in using the race-based coefficient
demonstrates that Welch's discrimination claims do not sound in health care law.

2012) (allowing section 504 claim under the Rehabilitation Act to proceed past summary judgment where plaintiff provided sufficient evidence that provider was deliberately indifferent when it failed to give her appropriate hearing aids necessary for communication during treatment); Green v. City of New York, 465 F.3d 65, 76–78 (2d Cir. 2006) (allowing ADA discrimination claim to proceed past summary judgment where plaintiff presented evidence that providers discriminated through using a "stereotypical view of the abilities of a seriously physically handicapped individual" in relation to the plaintiff).  Further, while dicta, the cases VUMC cites in support of its THCLA argument in fact support a finding that Welch's claims sound in discrimination law, rather than health care liability law.  In those cases, the plaintiffs did not properly raise civil rights claims because they did not allege plausible allegations of discrimination like those present in the instant case.  Powell, 2021 WL 8053886, at *2 (6th Cir. Dec. 13, 2021) (affirming dismissal of ADA claim where plaintiff did "not allege that he was denied medical care or treatment based on his disability"); Sharp, 2021 WL 7084879, at *2 ("Although the Court presumes at this stage that Plaintiff is a qualified individual with a disability, the complaint contains no allegation creating a reasonable inference that Defendant discriminated against Plaintiff because of his disability.").

To the extent that Welch does claim that VUMC provided inadequate health care services or inappropriate care for his conditions, VUMC is correct that such allegations sound in medical malpractice and cannot stand because Welch has not provided any evidence that he has complied with the THCLA's statutory obligations to bring such claims.  Ellithorpe, 479 S.W.3d at 827. However, the Court finds no allegations, or arguments by Welch, of that nature.  Here, the gravamen of the Complaint is that Defendants' use of the race-based coefficient, and their subsequent failures to not update wait times efficiently, effectively prevented Welch and other Black kidney transplant candidates from obtaining full access to the national kidney transplant

waitlist (Doc. No. 1 ¶¶ 37, 71, 84).  See Estate of French, 333 S.W.3d at 557.  Welch's theory of liability is ultimately one of inadequate procedures, rather than inadequate medical care.  See Gunter v. Laboratory Corp. of America, 121 S.W.3d 636, 641 (Tenn. 2003) (concluding that claim concerning adequacy of laboratory's blood testing procedures was one for common law negligence, not medical malpractice).  As this theory of liability is not premised on VUMC's provision of, or failure to provide, medical services—but rather, Welch's inability to access such services on account of his race—Welch need not satisfy the requirements of the THCLA.  See Tenn. Code Ann. § 29–26–101(a)(1).

### 5.  Injunctive Relief

Next, Defendants assert they are entitled to summary judgment on Welch's request for injunctive relief.  (Doc. No. 91).  However, the Court will grant UNOS's motion to dismiss on this issue, see supra, Section II.A.2, and Welch asserts that he no longer seeks injunctive relief.  (Doc. No. 113 at 28).  Accordingly, this issue is moot, and the Court need not address it further.

### 6.  Punitive Damages

Finally, Defendants argue they are entitled to a judgment as a matter of law that Welch cannot recover punitive damages under either Title VI or the THRA as a matter of law.  (Doc. No. 91 at 34).  In response, Welch asserts that he does not intend to seek punitive damages related to his discrimination claims, bur rather only for his breach of fiduciary duty claim.  (Doc. No. 113 at 27).  Because the Court has found that VUMC is entitled to judgment as a matter of law on Welch's breach of fiduciary duty claim, see supra, Section III.B.2, the Court need not further consider the parties' arguments on the punitive damages issue.  Defendants' motion will be granted on Welch's request for punitive damages.

64

## IV.      CONCLUSION

For the foregoing reasons, the Court will rule as follows: UNOS's Motion to Dismiss (Doc. No. 21) will be granted on Welch's request for injunctive relief, but denied in all other respects; VUMC's Motion to Dismiss (Doc. No. 23) will be denied; Defendants' Motion for Summary Judgment (Doc. No. 86) will be granted on Welch's Title VI claim against UNOS, Welch's breach of fiduciary duty claim against VUMC, and Welch's request for punitive damages, and will be denied in all other respects; Welch's Motion for Summary Judgment (Doc. No. 95) will be denied; and Welch's Motion for Oral Argument (Doc. No. 115) will be denied as moot.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

65