| | | |
|---|---|---|
| DEXTER WELCH | ) | Civil Action No. 3:24-CV-00422 |
| | ) | |
| Plaintiff, | ) | Judge:  Waverly D. Crenshaw, Jr. |
| | ) | Magistrate Judge:  Barbara D. Holmes |
| v. | ) | |
| | ) | **JURY DEMAND** |
| UNITED NETWORK FOR ORGAN | ) | |
| SHARING; and VANDERBILT | ) | |
| UNIVERSITY MEDICAL CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER ON SUMMARY JUDGMENT

### I.     INTRODUCTION

Pursuant to Local Rule 7.01(a), Federal Rule of Civil Procedure 54(b), and to *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 958–59 (6th Cir. 2004), Plaintiff Dexter Welch respectfully moves for reconsideration of two of the Court's holdings from its memorandum opinion and order on summary judgment (ECF No. 118 & 119) (collectively the "Opinion").

First, the Court should reconsider its ruling that strict scrutiny does not apply to racial classifications under Title VI or the Tennessee Human Rights Act. The Court cites Justice Gorsuch's concurrence in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*") for the proposition that analyzing equal protection claims under the Fourteenth Amendment in the same manner as racial discrimination claims under Title VI "is implausible on its face." Opinion at 47 (citing 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring)). This holding presents clear error for two reasons. First, Justice Gorsuch's concurrence does not alter the Supreme Court's binding, majority opinion, or the earlier controlling Supreme Court precedent,

all of which applies strict scrutiny when considering an express racial classification under Title VI—just like the classification in this case. Further, even if Justice Gorsuch's concurrence was binding, it would favor Plaintiff, not VUMC, **because it finds that racial classifications are *never permissible*, and need not receive *any* form of scrutiny**:

> The Equal Protection Clause addresses all manner of distinctions between persons and this Court has held that it implies different degrees of judicial scrutiny for different kinds of classifications. So, for example, courts apply strict scrutiny for classifications based on race, color, and national origin; intermediate scrutiny for classifications based on sex; and rational-basis review for classifications based on more prosaic grounds. By contrast, **Title VI targets only certain classifications— those based on race, color, or national origin. And that law does not direct courts to subject these classifications to one degree of scrutiny or another. Instead, as we have seen, its rule is as uncomplicated as it is momentous. *Under Title VI, it is always unlawful to discriminate among persons even in part because of race, color, or national origin.***

*Id.* at 308–09 (emphasis added).

Second, the Court should reconsider its granting of summary judgment in favor of VUMC on Plaintiff's breach of fiduciary duty claim, and related granting of summary judgment on Plaintiff's request for punitive damages. The Court granted VUMC's motion because Plaintiff purportedly failed (a) to cite evidence indicating which VUMC employees breached the alleged fiduciary duties, and (b) to show that the employees breaching such duties were employed by VUMC, acting within the scope of their employment. Opinion at 53. The Court should reconsider its holding because Plaintiff's briefs, separate statements, and supporting evidence (as well as *Defendants'* papers) provide substantial evidence not considered by the Court in its Opinion, specifically identifying the VUMC doctors that breached duties to Mr. Welch, and showing that such breaches were committed within their scope of employment, i.e., providing medical services to Mr. Welch on behalf of VUMC. Defendants cannot dispute that any of the evidence referred to herein was properly in the record on summary judgment.

Because binding Supreme Court authority and submitted record evidence demonstrate the Court committed clear, reversible error in these two holdings, Plaintiff respectfully requests the Court reconsider.

## II.     LEGAL STANDARD

Federal common law and Federal Rule of Civil Procedure 54(b) authorize motions for reconsideration. *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) ("*Rodriguez*"). District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment. *Id.* (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). This authority allows district courts "to afford such relief from [interlocutory orders] as justice requires." *Rodriguez* at 959 (citing *Citibank N.A. v. Fed. Deposit Ins. Corp.*, 857 F. Supp. 976, 981 (D.D.C.1994)); *see also Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981). Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice. *Rodriguez* at 959.

## III.    ARGUMENT

### A.     The Court's interpretation of *Students for Fair Admission* is clear error.

The Court committed clear, reversible error by failing to follow Supreme Court precedent requiring that racial classifications be subjected to strict scrutiny, reasoning as follows:

> To establish a Title VI claim, Welch must "first prove the threshold requirement that the program from which [he] was excluded receives Federal financial assistance." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1357 (6th Cir. 1996). Then, Welch must establish that Defendants "intended to discriminate on the basis of race[,]" in that the decision to exclude Welch from a federally financed program "was motivated by race and that his race was a determining factor in the exclusion." *Id.*
>
> . . .

3

> VUMC's second argument is dispositive here. VUMC is correct that Welch applies
> the wrong standard—the one for equal protection claims under the Fourteenth
> Amendment, not Title VI claims—in his motion. (See Doc. No. 94 at 18–22 (citing
> equal protection cases and standard in support of his motion)). As VUMC properly
> points out, the Sixth Circuit has rejected this approach on Title VII claims, noting
> "[d]ifferences between the language of the statute and the Constitution supply an
> initial reason why one test does not apply to the other." L.W. by and through
> Williams v. Skrmetti, 83 F.4th 460, 484 (6th Cir. 2023). Justice Gorsuch has echoed
> a similar sentiment as to Title VI claims, noting that Title VI and the Equal
> Protection Clause are "differently worded provisions," and so analyzing them as if
> they "mean the same thing is implausible on its face." Students for Fair Admissions,
> Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 308 (2023) (Gorsuch,
> J., concurring) (distinguishing the Equal Protection Clause from Title VI); see id.
> at 290 (concluding that Title VI and Title VII's terms are "essentially identical").
>
> Because Welch has not presented any evidence demonstrating there is no genuine
> dispute of material fact on any of the elements of his Title VI claim—given he does
> not even cite to the correct elements of his claim—he has not carried his burden to
> establish he is entitled to summary judgment here. See Rodgers, 344 F.3d at 595.

Opinion at 24, 47.

This holding contradicts nearly 50 years of binding Supreme Court precedent. In *Regents of University of California v. Bakke*, the Supreme Court held that racial classifications are subject to strict scrutiny under Title VI, to the same extent as the Equal Protection Clause. 438 U.S. 265 at 287–91 (1978) ("In view of the clear legislative intent, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment."). The Supreme Court reiterated this holding in *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001), *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003), and most recently, in *SFFA*, 600 U.S. at 198 n. 2.

In *SFFA*, the plaintiff challenged racial classifications made in college admissions under both "Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. § 2000d et seq., and the Equal Protection Clause of the Fourteenth Amendment." *SFFA*, 600 U.S. at 197–98. The Supreme Court then proceeded to engage in a strict scrutiny analysis, finding the use of racial classifications in college admissions failed strict scrutiny, even where motivated by "commendable goals[.]" *See*

*id.* at 206–25. It is true that this discussion was couched in the Equal Protection Clause, but that is because, as explained in an earlier footnote in *SFFA*, and consistent with Supreme Court precedent tracing back to *Bakke*, if a racial classification fails scrutiny under the Equal Protection Clause—applying strict scrutiny—then it also violates Title VI. *Id.* at 198 n. 2 (quoting *Gratz*, 539 U.S. at 276, n. 23. This is why the Supreme Court discussed Equal Protection and Title VI arguments concurrently, without distinction, and this is why Mr. Welch correctly structured his Title VI analysis to mirror that analysis recently performed by the Supreme Court.

The Court took a wrong turn in misreading Justice Gorsuch's concurrence as suggested by Defendants. Justice Gorsuch does state that strict scrutiny should not apply to Title VI claims, believing *Bakke* to have been wrongly decided decades ago. But that is only half of his argument. The other half is *why* he suggests strict scrutiny should not apply to Title VI claims:

> The Equal Protection Clause addresses all manner of distinctions between persons and this Court has held that it implies different degrees of judicial scrutiny for different kinds of classifications. So, for example, courts apply strict scrutiny for classifications based on race, color, and national origin; intermediate scrutiny for classifications based on sex; and rational-basis review for classifications based on more prosaic grounds. By contrast, Title VI targets only certain classifications—those based on race, color, or national origin. And that law does not direct courts to subject these classifications to one degree of scrutiny or another. Instead, as we have seen, its rule is as uncomplicated as it is momentous. ***Under Title VI, it is <u>always</u> unlawful to discriminate among persons even in part because of race, color, or national origin.***

*Id.* at 308–09. Justice Gorsuch does not counsel against the Court applying strict scrutiny in favor of some other level of scrutiny or analysis; instead, he counsels that the Court does not need to apply any scrutiny at all, because "**under Title VI, it is always unlawful [for VUMC] to discriminate among persons even in part because of race, color, or national origin**." Justice Gorsuch's reasoning makes clear that he believes use of racial classifications like the race-based coefficient is illegal *per se* under Title VI:

Title VI bears independent force beyond the Equal Protection Clause. Nothing in it grants special deference to university administrators. Nothing in it endorses racial discrimination to any degree or for any purpose. Title VI is more consequential than that.

*

In the aftermath of the Civil War, Congress took vital steps toward realizing the promise of equality under the law. As important as those initial efforts were, much work remained to be done—and much remains today. But by any measure, the Civil Rights Act of 1964 stands as a landmark on this journey and one of the Nation's great triumphs. We have no right to make a blank sheet of any of its provisions. And when we look to the clear and powerful command Congress set forth in that law, these cases all but resolve themselves. ***Under Title VI, it is never permissible "'to say "yes" to one person . . . but to say "no" to another person'" even in part "'because of the color of his skin.'"***

*Id.* at 310 (emphasis added). Nonetheless, it goes without saying that one Justice's concurrence cannot overrule the majority's reasoning, nor can it overrule *Bakke* and its progeny—even if Justice Gorsuch is correct that Title VI should make all racial classifications illegal, a position that would benefit Mr. Welch.

Moreover, the Sixth Circuit *has not* rejected and *could not* reject this Supreme Court precedent mandating application of strict scrutiny when confronting racial classifications under Title VI. In *Skrmetti*, the case cited to by this Court to support that proposition, the Sixth Circuit considered a challenge brought under the Equal Protection Clause to state laws disallowing certain gender-affirming care for minors and held that no protected classification was implicated:

In this case, the laws do not deny anyone general healthcare treatment based on any such stereotypes; they merely deny the same medical treatments to all children facing gender dysphoria if they are 17 or under, then permit all of these treatments after they reach the age of majority.

83 F.4th at 468–70, 485. Later in the opinion, *Skrmetti* considered the argument that transgender persons could constitute a protected class, but finding no support for that position, returned to the Equal Protection framework. *Id.* at 486 ("Until that changes, rational basis review applies."). *Skrmetti* cites the Justice Gorsuch concurrence to make the point that Title VII offers greater

protection than the Equal Protection Clause when distinguishing *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), where the Supreme Court held that an employer violates Title VII by firing an employee because of their transgender status. Again, the point is that Mr. Welch's Title VI claim provides more protection against discrimination than Equal Protection, not less.

Next, to the extent the Court suggests that Plaintiff need show more than use of a harmful racial classification, the Court's recitation of the elements for Plaintiff's claim is incorrect. The Court cites to *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1357 (6th Cir. 1996), in support of the proposition that "Welch must establish that Defendants 'intended to discriminate on the basis of race[,]' in that the decision to exclude Welch from a federally financed program 'was motivated by race and that his race was a determining factor in the exclusion.'" Opinion at 24. *Buchanon*, though, did not involve a racial classification, but instead an unsupported claim that a child "would not have been arrested had he been a Caucasian student[.]" 99 F.3d at 1356–57. As the Court correctly explained elsewhere, there is a distinction between direct evidence and circumstantial evidence of discriminatory intent, Opinion at 40, and *Buchanon* is a circumstantial evidence case at best, where Mr. Welch presents direct evidence of discriminatory intent through use of a race-based policy. *See* Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ") at 18–19 (DOJ's Title VI Legal Manual explains that strict scrutiny applies to racial classifications under Title VI).[1]

Nor do any of the authorities cited by the Court or the Defendants confront *direct evidence* of racial discrimination, i.e., an express racial classification, such that they could provide the "correct elements" of Mr. Welch's claim. *See McGugan v. Aldana-Bernier*, 752 F.3d 224, 228,

---

[1] The Court is not internally consistent in this analysis because elsewhere the Court rightfully explains that Plaintiff's claims are subject to a but-for standard of causation, Opinion at 48–49, and here, the Court states that race must be "the determining factor in the exclusion."

231–32 (2d Cir. 2014) (doctor's medical determination to sedate particular mentally ill patient—not guided by any racial classification or policy—insufficient to show intentional discrimination under the Rehabilitation Act); *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 752 (W.D. Tenn. 2012) (addressing Equal Protection challenge to facially neutral statute, but recognizing that, "[w]ithout doubt, any classification based on race must be analyzed under strict scrutiny"); *Hunt v. Cromartie*, 526 U.S. 541, 546–47 (1999) (addressing Equal Protection challenge to facially neutral law, but recognizing that "all laws that classify citizens on the basis of race, including racially gerrymandered districting schemes, are constitutionally suspect and must be strictly scrutinized").

The Court's criticism of Mr. Welch for failing to cite the correct elements of his claim is thus unfounded. Mr. Welch followed the same analysis as the majority in *SFFA*, which, unlike any of the cases relied upon by Defendants or the Court, involved a Title VI challenge to a racial classification. It is not clear why the Court would expect Mr. Welch to follow Justice Gorsuch's concurrence, to the exclusion of the majority's binding approach, but regardless, under Justice Gorsuch's approach, all race-based classifications are illegal, and Plaintiff certainly established that VUMC uses a race-based classification. The Court acknowledged:

> [I]t is undisputed that: (1) the race-based coefficient multiples a Black patient's eGFR score by roughly 1.21 based solely on that patient's race (Doc. No. 95-38 at 27; Doc. No. Doc. No. 95-31 ¶¶ 41–42); and (2) the eGFR value, which is artificially inflated for Black patients by using the race-based coefficient, is one metric that impacts whether, and when, one qualifies to be put on the waitlist. (Doc. No. 110 ¶¶ 17–18, 29). **The Court agrees with Welch that there is abundant evidence in the record showing that VUMC has repeatedly admitted to using this race-based coefficient in practice, including as applied to Welch**. (Doc. No. 113-18 at 27:25–28:4; Doc. No. 113-23 at 22:9–11).

Opinion at 41–42 (emphasis added).

In summary, respectfully, the Court's decision on summary judgment took Judge Gorsuch's concurrence and turned it on its head. Justice Gorsuch argued that respect for the Civil Rights Act of 1964 requires that racial classifications can *never* be deemed lawful; but the Court

used his point that strict scrutiny is *too lenient* of a standard in applying some lesser, undefined standard pulled from VUMC's inapposite cases. The Court should reconsider that decision and subject VUMC's use of the race-based coefficient to strict scrutiny.

**B.**     **Granting VUMC's Motion for Summary Judgment on Plaintiff's breach of fiduciary duty claim and request for punitive damages was clear error.**

In the Opinion, the Court held:

> "Absent from Welch's briefing and supporting materials are any reference to the 'person causing the injury' that **Welch** asserts here . . . **Welch does not cite to any evidence demonstrating what doctor breached the duties he alleges here, i.e. registering him to UNOS using a race-based coefficient, failing to recalculate Welch's waitlist time for a year, and failing to disclose the same.** ([citing Plaintiff's Opposition to Defendants' Motion for Summary Judgment] at 24–26 (not citing any evidence supporting his breach of fiduciary duty claim)). The same is true as to those doctors' employments—**Welch points to no evidence that those doctors, whoever they may be, are employed by VUMC.** ([citing] *id.*). And Welch provides no argument, or citations to evidence, **establishing that those unnamed doctors acted within the scope of their employments** when committing the alleged breaches here."

Opinion at 53 (emphasis added). The Court clearly erred for two reasons.

**1.**     **The Court misstated the bases for Plaintiff's breach of fiduciary duty claim as articulated in his papers.**

The Court misstated the fundamental bases of Plaintiff's breach of fiduciary duty claim as argued in his MSJ and Opposition to Defendants' MSJ: (a) race-based discrimination via use of the race-based coefficient on Plaintiff's eGFR scores, and (b) failure to disclose that discriminatory use of the race-based coefficient to Plaintiff. *See* Plaintiff's MSJ at 29–30 & n.6; ECF No. 113 ("Plaintiff's MSJ Oppo.") at 25. These breaches differ significantly from those the Court articulated in the portion of the Opinion quoted above. Plaintiff's proffered breach is not "registering him to UNOS using a race-based coefficient;" nor is Plaintiff's proffered breach "failing to recalculate Welch's waitlist time for a year[,]" Opinion at 53, in fact, it is undisputed

9

that VUMC did not register Plaintiff on the basis of an eGFR score. *See* ECF No. 96 ("Plaintiff's SS" or "SS") ¶ 34 ("VUMC never registered Plaintiff on the waitlist on the basis of a qualifying GFR score, instead listing Plaintiff in July of 2019, after he began dialysis."). Rather, in Plaintiff's MSJ and Plaintiff's MSJ Oppo., Plaintiff stated the bases of his breach of fiduciary duty claim as follows:

> "Because Plaintiff was a VUMC patient, VUMC had a duty to 'disclose material information' such as risks and complications associated with' []medical practices or their 'experimental nature' . . . **VUMC failed to disclose to Plaintiff that it used the race-based coefficient to adjust his kidney function scores for well over a decade, until at least 2023, when it was required to notify Plaintiff that he may be entitled to a wait time adjustment**. SS ¶ 65. **Even when VUMC discontinued use of the race-based coefficient in July of 2020, finding that the practice was an 'inappropriate use of race as a proxy of biologic or genetic difference,' VUMC gave no notice to Plaintiff**. Venezia Decl. Exh. GGG. **Instead, as discussed above, VUMC decided to conceal its prior use of the practice from Black patients, developing a pamphlet for Black patients that omitted any reference to race, or that their race had impacted calculation of their eGFR scores**, representing that the matter 'neither affects your actual kidney function, nor impacts your care negatively in any way.' SS ¶ 62 (citing Umeukeje Depo. Exh. 139 at 'You may have been . . . to your providers'). **In summary, while VUMC knew or should have known that the race-based coefficient was discriminatory from its inception, even after VUMC admitted the test was improper, VUMC decided to lie to its Black patients and conceal that race had been used to calculate their kidney function scores** . . . " Plaintiff's MSJ at 29–30 (emphasis added) (legal citations omitted).
> . . .
>
> "As explained in Plaintiff's Motion for Summary Judgment, **VUMC and its doctors breached their fiduciary duty to Plaintiff by failing to inform Plaintiff they were using the race-based coefficient to adjust his kidney function scores solely because he is Black**. ECF No. 95-1 at 29–30. **This breach was further compounded because VUMC took steps to hide the practice from its Black patients, specifically creating a pamphlet for Black patients that omitted any reference to race or race-based adjustments to eGFR scores**. SS ¶ 62. This breached the well-established duty of disclosure. While failure to disclose is sufficient to defeat summary judgment, **a reasonable juror could also recognize the fiduciary duty to refrain from race-based discrimination against patients, as did the courts in *Randall* and *Rowe*, and find VUMC liable on those additional grounds**. Plaintiff's MSJ Oppo. at 26; *see also* Plaintiff's MSJ at 29, n.6 ("Both *Randall* and *Rowe* acknowledge that the hospital's fiduciary duty may

go further than disclosure; however, the mere failure to disclose is sufficient for Plaintiff to prevail here.").

The difference between Plaintiff's stated grounds for breach and the Court's misstated framing should change the Court's decision. Much of the evidence the Court cites as "absent" is not in the record because it is not consistent with, or necessary to support, Mr. Welch's claim. For instance, the Court states, "The record remains devoid of any evidence on who registered Welch for UNOS with the race-based coefficient . . . [and] who reported that [adjusted waitlist] time to UNOS." Opinion at 54. The record is devoid of such evidence because that is not what Mr. Welch argues occurred. *See* Plaintiff's SS ¶ 34 (cited *supra*). For the Court to put Plaintiff's breach of fiduciary duty claim before the jury, however, there is ample evidence in the record of what VUMC doctors breached their duty to Mr. Welch.

Again, Plaintiff bases his claim on two breaches: (1) VUMC's medical personnel's discriminatory use of the race-based coefficient to calculate Plaintiff's eGFR scores—*preventing* his placement on UNOS's waitlist for years—and (2) VUMC's failure to disclose that use. Plaintiff's evidence of those grounds for breach was abundant on summary judgment.

### 2. The Court did not address record evidence supporting Plaintiff's claim for breach of fiduciary duty.

Even after properly framing the bases of his breach claim, to demonstrate why the Court should reconsider its ruling, Plaintiff must show that the breaching actions were performed by VUMC medical professionals acting within the scope of their employment. Opinion at 54. Contrary to the Court's Opinion, Plaintiff cites much more than a "scintilla of evidence." Opinion at 54. To find it, the Court need not "wade through and search the entire record for some specific facts that might support" Plaintiff's claim. *Id.* Such evidence is readily apparent from the Plaintiff's key evidentiary exhibits, for example, the November 6, 2013 medical record showing that Dr.

11

Stephen Raffanti failed to refer Mr. Welch to the waitlist because application of the race-based coefficient put him above the 20 mL/min cutoff. Even more evidence was present in Defendants' papers as well.

Plaintiff will guide the Court through the relevant evidence, in specific detail, to demonstrate why the Court should reconsider its holding. But Plaintiff also raises two other points for the Court's consideration:

*First*, Defendants never argued what the Court has held—that VUMC is not liable for breach of fiduciary duty as a matter of law because Plaintiff failed to show the VUMC doctors were in fact employed by VUMC or acting in the scope of their employment. Indeed, the overarching theme of VUMC's defense was that its doctors used sound medical discretion in applying the race-based coefficient. It was not foreseeable to Plaintiff that this case would be decided on the grounds that the VUMC doctors that VUMC argued exercised sound medical discretion somehow were not VUMC doctors at all, or were not acting within the scope of their employment in providing medical care to Mr. Welch. Regardless, neither argument holds.

*Second*, it goes without saying that doctors, in evaluating patients and their kidney function scores to make transplant referral recommendations, are acting within the scope of their employment at their respective hospitals. Providing medical care at the hospitals where they work is what doctors do. All of the conduct Plaintiff alleges demonstrates his VUMC doctors' breach of their fiduciary duty stemmed from those doctors' medical care of Mr. Welch while he was a patient at VUMC, where he has received treatment for more than 13 years. Welch Decl. ¶ 2. The relevant case cited by the Opinion regarding vicarious liability of hospitals for the acts of their doctors concerns medical treatment performed by those doctors at their respective hospitals. *See, e.g.*, *Johnson v. LeBonheur Children's Med. Cntr.*, 74 S.W.3d 338, 344 (Tenn. 2002) ("[w]hen a state-

employed physician resident performs a rotation at a private hospital, the same acts or omissions may be within the resident's scope of employment with the State and within the resident's scope of employment with the private hospital");

VUMC cannot seriously dispute that its doctors were acting within the scope of their employment at VUMC while providing medical treatment to Mr. Welch at VUMC. Sufficient record evidence permits the jury to determine whether the accused aspects of that medical care— use of the race-based coefficient and failure to disclose the same—amounted to a breach of fiduciary duty. A discussion of that evidence follows:

   a.   **Evidence Showing VUMC Medical Personnel, Acting Within the Scope of Their Employment, Discriminated Against Plaintiff via use of the Race-Based Coefficient**

In his Motion for Summary Judgment, and again in his Opposition, Mr. Welch's brief cited to two medical records dated November 6, 2013, both taken in the course of Plaintiff's treatment at VUMC. Plaintiff's MSJ at 7; Plaintiff's Separate Statement ("SS") ¶¶ 31–33; Plaintiff's MSJ Oppo. at 5 (citing SS ¶¶ 31–33). The first medical record included Mr. Welch's lab scores, and showed that he had an eGFR score of 18 mL/min, and an eGFR AA score of 22 mL/min. Plaintiff's MSJ at 7; SS ¶¶ 31–33 (citing Venezia Decl. Exhs. LL, NN).

13

```
COMP METABOLIC PANEL - CmpMet
  (Comments: Clinic #: 615343759Z.)2013/11/06 14:14      acc: 13-310-005768-CMP
  CHLORIDE BLOOD    101 mmol/L (ref: 98-107)
  SODIUM BLOOD    136 mmol/L (ref: 136-144)
  POTASSIUM BLOOD    4.0 mmol/L (ref: 3.3-4.8)
      (Comments: Serum Potassium Reference Range = 3.5-5.1 mmol/L)
  CARBON DIOXIDE BLOOD    24 mmol/L (ref: 21-29)
  ANION GAP    11
  ALT BLOOD    10 unit/L (ref: 0-55)
  AST BLOOD    17 unit/L (ref: 5-40)
  ALKALINE PHOSPHATASE BLD    110 unit/L (ref: 40-150)
  GLUCOSE BLOOD    81 mg/dL (ref: 70-99)
  UREA NITROGEN BLOOD    42* mg/dL (ref: 7-21)
  CREATININE BLOOD    3.65* mg/dL (ref: 0.72-1.25)
  eGFR    18 ml/min/1.73m2
  eGFRAA    22 ml/min/1.73m2
  CALCIUM BLOOD    8.4 mg/dL (ref: 8.4-10.5)
  BILIRUBIN TOTAL BLOOD    0.3 mg/dL (ref: 0.2-1.2)
  ALBUMIN BLOOD    3.6 gm/dL (ref: 3.5-5.2)
```

The second medical record, reviewed by VUMC Dr. Stephen Raffanti, states, under "Recommendations," "Transplant: defer until eGFR < 20." Venezia Decl. Exh. LL:

```
███████  WELCH, DEXTER W JR.49 year old male02/04/1964 - then 49YO M  (████/1964 - then
49YO M)Actions
Nephrology Return Clinic Visit  2013/11/06 14:05 Created by: Wang, Zhijian  Electronically signed by: Wang,
Zhijian (nurse practitioner) (wangc6e) on 2013/11/06 22:50:16 (Wang, Zhijian)
Reviewed by: Raffanti, Stephen P on 11/25/2013 17:31
        Vanderbilt University Medical Center    Welch, Dexter W Jr.
        Nephrology Return Clinic Visit         ███████

                                                Case#
```



| Date | Nt-PTH | | |
|------|--------|---|---|
| 11/06/13 | 14:14 | 653 | |

**Assessment**
1. Chronic Kidney Disease due to ██████ ████
2. Nephrotic range protinuria (may have resolved)

**Recommendations**
1. CKD:Cr 3.65 mg/dL, and eGFR 22 mL/min/1.73m2, renal function declined.
2. Proteinuria: Spot protein: 189 mg/dL, Spot creat: 28 mg/dL, PCR 6.8. worsened, off RAAS blockade d/t hyperkalemia.
3. Acid Base: Bicarb 24 mmol/L. Not on supplement, okay.
4. Electrolytes: K+ 4.0 mmol/L today, off RAAS blockade now, okay
5. Blood Pressure: too high, add Metoprolol 25 mg orally BID since HR>100.
6. Volume status: euvolemic on hctz
7. Nutrition: albumin 3.6 gm/dL, at goal.
8. Mineral metabolism: Ca 8.4 mg/dL, Phos 3.0 mg/dL, iPTH 653 pg/mL, c/w secondary hyperparathyroidism of renal origin, 25-OH Vit D 10 (03/05/2013), will give Ergocalciferol 50,000 unit orally weekly x 12 weeks.
9. Anemia: Hgb 12.3 gm/dL, Hct 38 % not on EPO. TSAT 27 % (03/05/13), Ferritin 55 ng/mL (03/05/13), okay.
10. Transplant: defer until GFR < 20
11. Access: defer until GFR < 20

RTC: 4 weeks with me

Written and electronically signed by
Wang, Zhijian NP

Vanderbilt University Medical Center

Release of Information (615) 322-2062

The record is replete with evidence that Dr. Raffanti was in fact a VUMC doctor, and Mr. Welch's primary care physician. *See* ECF No. 88, Ex. 5 (Declaration of Heidi M. Schaefer M.D.), Ex. A (Plaintiff's VUMC medical records) at VUMC 020038 ("Date of services: 2017/07/05 14:20 Dr. Steven Raffanti"), 020157 (Mr. Welch is "followed by Dr. Raffanti, in the Comprehensive Care Clinic."), 020365 ("Health Care Team: - Raffanti, Stephan P - Primary Care Physician Vanderbilt University Medical Center"), 020383 ("He is followed by Dr. Raffanti at the Comprehensive Care Center"); *see also* Forbes Depo. at 39:11–21 (When discussing this record, VUMC's 30(b)(6) witness testified, "the supporting documentation that this clinician had was 22").[2] Dr. Raffanti, in fact, did not refer Mr. Welch for transplant at this time (nor did any other VUMC doctor refer him on the basis of a qualifying eGFR score). SS ¶ 34.

---

[2] A "clinician" is a doctor. Merriam-Webster defines the term as "a person qualified in the clinical practice of medicine . . ." and lists "doctor" as one synonym for the term. *See* Merriam-Webster definition of "clinician," https://www.merriam-

Thus, the answer to the question "which VUMC doctor relied on the race-based coefficient in failing to refer Mr. Welch to the waitlist" is clear and abundantly supported in the record: Dr. Stephen Raffanti.

At risk of belaboring the point, because the Court characterized Mr. Welch's evidentiary showing as a "no more than a 'scintilla of evidence[,]'" Opinion at 54, and while the VUMC medical records are sufficient, Mr. Welch further notes that Defendants' own evidence demonstrates that VUMC's doctors control the decision whether to refer a patient for transplant, and what factors those doctors should consider, including race-based eGFR scores.

For example, VUMC's expert, Dr. Alex Wiseman, summarizes Mr. Welch's November 6, 2013 appointment at VUMC as follows: "Welch was seen by a **Nephrology advanced practice provider on 11/06/2013, with a plan for follow-up with the Nephrologist in four weeks**." ECF No. 88 (Exhibit 6 to Defendants' Notice of Filing) (Wiseman Report), Report page 11 (under "Summary of 10/07/2013 through 12/18/2013"). Nephrologists are kidney doctors.

Defendants never argued that VUMC's doctors did not use the race-based coefficient; instead, they argued that VUMC doctors consider a number of factors including eGFR scores when considering whether to refer a patient to the kidney waitlist:

> "Evaluating candidates for transplantation involves input and direction from multiple specialties including transplant nephrology, transplant surgery, transplant social work, nursing coordinators, nutrition services, financial coordinators, and other specialties such as cardiology, hepatology, and infection disease . . . **VUMC healthcare professionals consider a variety of factors in assessing whether to refer a patient for potential registration on the national kidney transplant waitlist . . . [including] the patient's kidney function**."

webster.com/dictionary/clinician#:~:text=Medical%20Definition-,clinician,research%20techniques%20or%20in%20theory (last accessed February 21, 2025); & Merriam-Webster synonyms of "clinician", https://www.merriam-webster.com/thesaurus/clinician (last accessed February 20, 2025).

Defendants' MSJ at 4 (citing NOF Ex. 3, Ex. A at 7; Defendants' Separate Statement ¶ 2) (emphasis added).

VUMC's experts—themselves doctors—opine that doctors enjoy the discretion to determine what method to use to assess a patient's kidney function, including, when it was still allowed, the race-based coefficient. *See*, *e.g.*, ECF No. 88 (Exhibit 2 to Defendants' Notice of Filing) (Cooper Report), § 5, ¶ 2 ("Trained healthcare professionals, and the healthcare facilities at which they are affiliated, are responsible for deciding which test method to use when determining a patient's kidney function."); ECF No. 88 (Exhibit 5 to Defendants' Notice of Filing) (Schaeffer Report), ¶ 3 ("**As a transplant nephrologist at VUMC, part of my role is to evaluate whether a patient who is referred to VUMC's kidney transplant program is an appropriate candidate for transplant listing**.") (emphasis added); *Id.* ¶ 5 ("VUMC healthcare professionals evaluate sustained and tending eGFR test results rather than a single eGFR result in making medical decisions related to a patient's kidney disease. Relatedly, VUMC healthcare professionals consider eGFR results in connection with their overall clinical assessment of a patient's kidney function.").

This evidence is more than sufficient for a reasonable jury to find that VUMC doctors, including Dr. Stephen Raffanti, acting within the scope of his employment, used the race-based coefficient in connection with delaying Mr. Welch's referral for transplant evaluation.

> **b.      Evidence Showing VUMC Medical Professionals, Acting Within the Scope of Their Employment, Failed to Disclose Use of the Race-Based Coefficient on Dexter Welch**

Plaintiff sufficiently established in his MSJ papers that no one at VUMC—doctor or otherwise—told Mr. Welch the race-based coefficient had been used against him until December

2023, when Dr. Rachel Forbes told him about his wait time adjustment. Plaintiff's MSJ at 7 (citing Plaintiff's SS ¶ 35 (citing the Declaration of Dexter Welch (ECF No. 113-2) ¶¶ 4, 8. Mr. Welch would have hoped that *any* of the doctors he has seen in his more-than-13 years as a patient at VUMC (Welch Decl. ¶ 2) would have informed him of VUMC's use of the race-based coefficient. But specifically, three doctors, all referenced in cited record evidence, could have and should have let him know.

First as explained above, Dr. Stephen Raffanti, Mr. Welch's primary care physician, reviewed the November 6, 2013 test that recommended against referring Mr. Welch for transplant evaluation because of the race-based coefficient. Second, Dr. Rachel Forbes was provided reports concerning Mr. Welch in May and July of 2017 (ECF No. 88 (Defs' NOF) Ex. 5 (Schaefer Decl.) at VUMC 19959, 20038), evaluated Mr. Welch for referral to the waitlist as part of a VUMC transplant committee in October 2018 (ECF No. 88 (Defs' NOF Ex. 5 (Schaefer Decl.) at VUMC 017973) and treated Mr. Welch through 2023. *See* ECF No. 88 (Defs' NOF) Ex. 6 (Wiseman Decl.) at 20–21 (noting Mr. Welch's appointments with Dr. Forbes in 2022 and 2023 relating to dialysis treatments). Third, Plaintiff identifies Dr. Julia Lewis as "his nephrologist" in VUMC medical records summarized by VUMC expert Dr. Alex Wiseman. *See* ECF No. 88, Ex. 6 (Declaration of Alex Wiseman), Ex. A (Plaintiff's VUMC medical records) at VUMC 007852. The same record states Dr. Lewis has counseled Mr. Welch "numerous times." *Id.* This is the same Dr. Lewis who co-created the race-based coefficient while a doctor at VUMC (Plaintiff's SS ¶¶ 25–28 & evidence cited therein), and who defended the race-based coefficient because of perceived racial differences in muscle mass (Plaintiff's SS ¶¶ 27–28, 59–60 & evidence cited therein).

All three of these VUMC doctors treated Dexter Welch. But none of these three VUMC doctors informed Mr. Welch that VUMC had applied the race-based coefficient to his eGFR scores until Dr. Forbes did, in December 2023, months after Mr. Welch's wait time had already been adjusted. None of these doctors informed Mr. Welch even though VUMC had ceased using the race-based coefficient as an institution three-and-a-half years prior, because it was racist, and, as the Court put it, "due to its lack of medical credibility." Opinion at 42 (citations omitted). Thus, the answer to the question "which VUMC doctors failed to inform Mr. Welch of VUMC's use of the race-based coefficient" is clear and abundantly supported in the record: Drs. Raffanti, Forbes, and Lewis.

Cited in Plaintiff's MSJ briefs, and by the Court's Opinion, the Tennessee Supreme Court held that a doctor–patient relationship imposes upon the doctor a duty to disclose material information. *Shadrick v. Coker*, 963 S.W.2d 726, 736 (Tenn. 1998); *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn. 1992). VUMC's doctors did not disclose that VUMC had once used the race-based coefficient on its Black patients like Dexter Welch. Rather, it tried to obscure its past actions with a patient flyer, drafted by another VUMC doctor, that made no mention of race whatsoever; an action the Court characterized as sufficient evidence demonstrating "VUMC acted in a way that was clearly unreasonable in light of known circumstances that the race-based coefficient had no medical validity, yet continued to pervade its medical system." Opinion at 44 (citations and internal quotations omitted).

The jury, not the Court, should decide the factual issue of whether VUMC's doctors' failure to tell Mr. Welch his race affected his healthcare at those doctors' hospital is a harmful breach of fiduciary duty. Finding for VUMC as a matter of law was clear error.[3]

Lastly, the Court's sole reason for denying Plaintiff the opportunity to argue for punitive damages at trial was the Court's granting of summary judgment for VUMC on the breach of fiduciary duty claim. Opinion at 64. Plaintiff thus respectfully requests the Court reconsider that holding and permit Plaintiff to pursue punitive damages at trial.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, Plaintiff respectfully requests the Court grant Plaintiff's Motion for Reconsideration, vacate the affected portions of the Opinion and issue a modified order on summary judgment. Specifically, Plaintiff requests that modified order (a) analyze Plaintiff's Title VI claim against VUMC under the standard mandated by *SFFA*, and (b) vacate the granting of summary judgment for VUMC on breach of fiduciary duty and the request for punitive damages.

---

[3] Plaintiff gave evidence of how the failure of any of Mr. Welch's numerous VUMC doctors to disclose the use of the race-based coefficient to Plaintiff proximately caused him harm, including by preventing him from demanding VUMC doctors use a race-neutral test, or by seeking race-neutral kidney care elsewhere. Plaintiff's MSJ at 7 (citing Plaintiff's SS ¶ 36 (citing Welch Decl. ¶¶ 5–6)); Plaintiff's MSJ §§ III.D.2–D.3

Respectfully submitted,

Dated:  February 21, 2025

*s/Matthew L. Venezia*
Matthew L. Venezia, *Pro Hac Vice*
California Bar No. 313812
Christopher W. Arledge, *Pro Hac Vice*
California Bar No. 200767
George B. A. Laiolo, *Pro Hac Vice*
California Bar No. 329850
Andrew R. Iglesias, *Pro Hac Vice*
California Bar No. 348791
ELLIS GEORGE LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Email:  mvenezia@ellisgeorge.com
Email:  carledge@ellisgeorge.com
Email:  glaiolo@ellisgeorge.com
Email:  aiglesias@ellisgeorge.com

*s/Jeffrey A. Greene*
Jeffrey A. Greene
Tennessee Bar No. 84135
1852 Wilson Pike
Franklin, TN 37067
Telephone:  (615) 477-4917
Email:  jeff@jgreene.us

*Attorneys for Plaintiff Dexter Welch*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 21, 2025 the foregoing

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**

**MOTION FOR RECONSIDERATION OF ORDER ON SUMMARY JUDGMENT** has been

served via CM/ECF, the Court's electronic case filing system, on all parties and counsel registered

with CM/ECF in this action as follows:

Attorneys for Defendant
UNITED NETWORK FOR ORGAN
SHARING

George H. Cate, III
Kimberly M. Ingram-Hogan
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
Telephone:   (615) 244-2582
Facsimile:    (615) 252-6380
Email:  gcate@bradley.com
Email:  kingram@bradley.com

Daniel M. Blouin
Thomas G. Weber
Tyler C. Richards
Winston & Strawn LLP
35 W Wacker Drive
Chicago, IL 60601-9703
Telephone:   (312) 558-7544
Telephone:   (312) 558-3260
Email:  dblouin@winston.com
Email:  tgweber@winston.com
Email:  trichards@winston.com

Attorneys for Defendant
VANDERBILT UNIVERSITY MEDICAL
CENTER

Erin Polly
Terrence M. McKelvey
Emma Wolfe
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, TN 37203
Telephone:   (615) 780-6700
Facsimile:    (615) 780-6799
Email:  erin.polly@klgates.com
Email:  terrence.mckelvey@klgates.com
Email:  emma.wolfe@klgates.com

*s/ Matthew L. Venezia*
Matthew L. Venezia